United States District Court for the
District of New Jersey
(CAMDEN)

RECEIVED

JAN 1 2 2021

AT 8:30_____ M
WILLIAM T. WALSH
CLERK

United States of America,    (    Case Number  07-459 (RBK)
(    Hon. Robert B. Kugler
v.    (
(    Motion For Relief
SERDAR TATAR,    (   (Fed. R. Civ. P. 60 (d)(3); 60
Defendant    (    (b)(3); 59 (a)(1); and or
(    60 (b)(6).)
(

## Outrageous Government Conduct

### Relief Sought

Serdar Tatar, Pro Se defendant moves this Court,
pursuant to Rule 60 (d)(3); 60 (b)(3), 60 (b)(6), and
59 (a)(1) for an order to set aside the judgment entered in this
action on April 29, 2009, and setting this action for a new
trial and or any other reason that justify relief.

## GROUNDS FOR MOTION

1. The judgment entered in this action should be set aside and a new trial held because:

2. The United States Government Attorney's committed fraud upon this Court, the Jury, denied defendant, Serdar Tatar, a fair trial in violation of the United States Constitution, under the Fifth, Sixth, and Fourteenth Amendments, when:

3. The Agents among others, Jay Rycek (JTTF), and Sean Brennan (SA), ommitted material evidence from their report dated 12/7/2006 which benefitted the defendant, In the case of 07-459. Either distroyed in bad faith, failed to perserve, did not turn over all written recordings of the said date, where defendant, Serdar Tatar was a suspect, being investigated at the time, was interrogated by the two agent's named above without an attorney present, without a warning against self incrimination in violation of the defendent's Constitutional Rights under the 5th Amen

4. The Defendant, after his arrest and charge, during the pre-trial phase at FDC Philadelphia, demanded from his court appointed lawyer, Richard Sparaco to

request for all discovery to be provided to defendant as a matter of Right, specifically the <u>ROUGH NOTES</u> of the interrogation of the defendant at his place of employment located at 1500 Cecil B. Moore, Philadelphia PA, by and from both law enforcement agent's who recorded their interrogation of the defendant among others, by written notes. Richard Sparaco, lied to the defendant, denying the existence of (Such Notes) well before trial, further, defense counsel failed to investigate as to the whereabouts of the "Hand Written Notes" of both agent's, failed to impeach, and call as witness for cross-examination of the agent's in question, specifically Sean Brennan, ignored the defendant's demands to present evidence, rendering below Standard, no reasonable legal service.

5. Defense Counsel, Richard Sparaco, cross-examined one of the Agent's of the two, who interrogated defendant, Specifically, Agent Rycek who admitted to the existence of the notes on record, (<u>See attachments to the Affidavit, Page 4759, line 7 thru 10</u>), which subsequently was never provided to the existence of the <u>notes</u> to defense counsel of the defendant Serdar Tatar.

6. While Still on, pre-trial, collectively the defense motioned court's order for the production of all discoverable →

3

→ material, evidence requested and demanded that all notes be preserved and provided to the defense and the defendant, Sardar Tatar, and his counsel (CSA) joined their motion requesting and demanding the same. (See Docket Entry: 172, 175 194)

7. The United States Attorney's Failed to Disclose all of the evidence, in violation of the Court's Order to provide all legally discoverable evidence which the defense has absolute right.

8. Presented to the court falsified evidence, testimony, committed fraud upon the court by repeatedly lying to the court, the jury, members of the community and the world at large (See attachment of the most recent example: The Government response to the defendants Request For Compassionat Release Page 28, lines 7 thru 8)

9. The defendant was falsly accused at trial that he said nothing about "any other involved party" in the alleged conspiracy, that he did not provide any one elses involvement to the two agent's who interrogated him. This false accusation greatly prejudiced Mr. Tatar, and this factual ommition of material evidence (the best evidence for defense) but for it's suppression would have resulted in a favorable outcome of the defendant's trial.

10. Defendant, being represented by a licensed attorney, even with his own incompetence (defendant) of the law, and not understanding the true nature of the events, still remarked at his own sentencing that, this evidence existed and was not provided, preserved, ommitted, indicating the existence of fraud, in his own defense and in declaration of his innocence and being denied justice (See: Sentencing transcript attached, on Page 51, lines 7 thru 16)

11. The United States Government, by the U.S. Attorney Micheal Hammer, U.S. Attorney Michael Fitzpatrick, and U.S. Attorney Norman Gross and all others involved in the case, have committed fraud upon the Court, the jurors, and against the defendant through out the entire phase of the proceedings every single time the date of incident of the defendant's interrogation 12/7/2006, was brought up and the U.S. Attorney's knowingly and willfully misrepresented material facts, suppressed vital evidence useful to and exculpatory to defense (their best evidence), which unduly prejudiced the defendant who was ultimately found guilty for conspiring to Murder U.S. Military Personell.

Defendant, via this Pro-Se Motion vehemently avers, but for the Outrageous Government Misconduct, the outcome of the trial would have been diffrent. (See Transcript Page, 4747 and 4748, lines 6-14 and 2-5)

12. On several occasions the defendant filed and requested for the production of the said 'Rough Notes' and or any related document, to Norman Gross, to the Department of Justice both the office of the Attorney General and Office of Professional Responsibility with the Federal Bureau of Investigation, diligently requesting an investigation and reprisal, all of which have went without unanswered and still outstanding.

13. The U.S. Attorney's have failed to disclose the existence of the hand written notes made specifically by Sean Brennan (SA) which containes the telephone number of the defendant Serdar Tatar's now co-defendant Muhammed Shenewer. The Agent's ommitted this material fact from their report, did not preserve or turnover the notes for discovery purposes, the U.S. Attorney's fradulantly suppressed this evidence and presented in court and under oath as a matter of fact, that the defendant did not provide this information when he was being interrogated on 12/7/2006. (See Transcript of Testimony of Jay Rycek, Page 4747, 4748, lines 6-14 and 2-5)

14. Jay Rycek, (JTTF) failed to disclose the existence of this evidence, (the hand written notes of Sean Brennan) who, in fact, gave crucial testimony at trial to the oppisite, Committing PERJURY, and fraud upon the Court, undermining the court preceedings, and violating the defendant's absolute →

→ Constitutional Rights to a Fair Trial and Due Process, (See Again Agent Rycek's Testimony, Page, 4747, 4748 lines, 6-14 and 2-5 attached to the Affidavit)

15. The testimony given by a material witness for the United States government was FALSE:

When, Jay Rycek, testified that the defendant did not provide the first name and telephone number of his, now Co-defendant in this case. This witness testified while under the security of a law-enforcement badge and in bad faith, against the defendant willfully condemning him to be found guilty of a crime, of which he would have not been found guilty but for this diliberate and criminal suppression of the evidence of the hand written notes of Sean Brennen which contained the above said information.

16. Counsel for the United States is guilty of suborning this PERJURY by repeating it over and over (The Purgred Testimony of Jay Rycek), and continued to use the same purgred testimony as recently as defendant's last motion in request for compassionate release, where Norman Gross, U.S. Attorney in his response to defendant's motion used the same perjured testimony. (See Attachment, Norman Gross response to the defendant's Request for Compassionate release, Page 28, lines 7 thru 8)

17. A certified copy of the transcripts of the testimony of Jay Rycek at the trial of <u>United States v. Shenewer</u>, is attached to the Affidavit of SERDAR TATAR.

18. Affidavit of the defendant shows the sequence of events of the said date, 12-7-2006 interrogation, and he was the only other person who has knowlege aside from the two agents who interrogated him, namely Sean Brennan and Jay Rycek.

19. The Affidavit also shows how the misconduct and fraud of the United States Attorney's could not have been discovered in time of the trial or even in time to move for new trial

a. The fraud would, under equitable principles, have been considered more than merely some thing to be exposed by cross-examination. The fraud was "intrinsic" in that the U.S. Attorney's deprived Mr. Tatar of the means of discovering fraud by false answeres to interrogatories and false statements to the court as to the unexpected nature of suppressing the hand Notes of Agent Brennan, and providing perjured testimony by fradulent means, Serdar Tatar was deprived of any reasonable opportunity to present impeachment evidence in the cross-examination of the Agent due to the suppression of the Notes.

b. The fraud will justify the relief sought by the defendant if this court orders a hearing to allow defense to present further evidence which will solidify his claims. The defendant has clearly established that Agent's, the United States Attorney's maliciously prosecuted Mr. Tatar, by suppressing key material evidence (Agent's hand written notes) withheld exculpatory evidence which was beneficial to the defense and hurt the Government case. Justice would require this court to hold a hearing with the presence of the defendant to establish an accurate record and rectify the wrong done by the government.

20. This motion is being made at the most reasonable time the defendant could have made it from the time of his arrest all the way up until now, he has diligently been appealing without the assistance of a licensed lawyer due to his inability to hire one. The reason the defendant has now discovered (newly) this fraud is due to his recent enrollment in a Paralegal Course via Adams State University, Center for Legal Studies, and realized, even though he has been saying it from the very begining, no one with knowledge of the law have helped Mr. Tatar despite of their obligations to the law.

21. A motion under Rule 60 (d)(3), 60 (b)(2), (b)(3), (b)(6) should be permitted because of the Governments Out-regeous misconduct of suppressing exculpatory evidence, maliciously prosecuting Mr. Tatar, presenting fradulent and false testimony to the Court precedings, denying Mr. Tatar right to Fair Trial, Due Process of Law, denying Tatar Justice guarenteed to him by the United States Constitution.

## LEGAL GROUNDS

22. The use of government agent's notes for purposes of cross-examination in accordance with the Jenks Act, 18 U.S.C. 3 3500, has been recognized by several courts of appeals (circuit courts) including the Fifth Circuit. This motion requires a hearing for a factual determination of whether such notes were distroyed in good faith by requiring by an order of the court that all government agents who have had any connection with the case to testify under oath as to the where abouts of their notes made during their investigation.

23. In United States v. Martin, 565 F 2d 362 (5th Cir 1978), the court upheld the defendant's conviction even though he was deprived of the notes of a Federal Bureau of Investigation agent at trial. The Court's decision, however, was bottomed on the find-

10

— ings that the notes were destroyed in normal practice and were not distrayed in bad faith.

24. The rationale for the preservation of agent's notes was best explained in United States v. Harris, 543 F 2d 1247, 1248 (10th cir. 1976), where the Court noted that the routine disposal of [interview] notes "amounts to a usurpation of the judicial function determining what evidence must be produced in a criminal case." Accordingly, the court held that the original or rough interview notes of an agent must be perserved for possible use at trial. See also, United States v. Parker, 549 F.2d 1217, 1224 n.8 (9th Cir. 1977), cert denied, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed. 2d 365 (1976), United States v. Johnson, 521 F.2d 1318 (9th Cir. 1975).

25. In Johnson, the court vacated and remanded a conviction for failure of trial Judge to require production of rough notes and to determine whether the notes were statements within purview of the Jenks Act. In that case, a Drug Enforcement Administration [agent tendered his case report only.]

26. In United States v. Harris, 543 F 2d at 1251 n.8, the court relied on Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L. Ed 2d 1287, 1959-2 C.B. (1959), and

— and United States v. Johnson, 337 F.2d 180, 201-02 (4th Cir. 1964), for the proposition that one purpose of the Jenks Act is that of affording the defense the opportunity to impeach witness. That function obviously cannot be fulfilled in this case if the government agents are permitted to destroy their notes before trial. Such destruction can have other consequences as well. In the United States v. Augenblick, 393 U.S. 348, 356, 89 S.Ct. 528, 21 L. Ed. 2d 537 (1969), the Court noted that, in some situations, denial of Jenks Act statement could rise to the level of denial of a sixth Amendment right. In United States v. Harrison, 524 F.2d 421, 433 n.39 (D.C Cir. 1975), the Court noted that sanctions can be imposed for destruction of notes as they can constitute ["crucial evidence"]. See Parker, in which the court imposed sanctions for the destruction after the trial court ordered them preserved.

27. In this case the defendant was aware the aformentioned agents were government agents and since the United States have used agent's testimony (Purjured) the defense was intitled to the notes the agents used to prepare their reports in connection with this case pursuant to the Jenks Act, 18 U.S.C § 5500. Since the defense was deprived, the government violated the provisions of 18 U.S.C. § 3500 and , very likely the Sixth Amendment to the United States Constitution.

28. Since this Court is not the one who allowed for such destruction of the said notes, such destruction became usurpation of this courts duty to determine whether said notes fall within the provisions of 18 USC § 3500 or the United States Constitution under the Sixth Amendment.

29. This motion titled as such "Outrageous Government Conduct" because the grounds for which this motion is being filed is that of a magnatude of Violation of Due Process Rights of Defendant arising out of Fraud Upon the Court. Such claim precludes ignorance as to the motion or misapprehension of its importnce. If this motion was being filed immidietly after the violation by way of Perjery the accompaning motion would be to dismiss the entire case against the defendant.

30. The Supreme Court has held that for purposes of the Fifth Amendment right against self-incrimination, interrogation includes and not only express questioning but also words or actions that the police should know are reasonably likely to elicit an incriminating response Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1602 (1980).

Unlike oral statements, written statements are discoverable even if they are not made in response to interrogation by a known government agent. An issue arises when a verbal

— Statement made by the defendant to another person, usually a government agent, who memorializes the statement in writing qualifies as a written statement made by the defendant. Criminal Rule 16 notes that "any record containing the substance of any relevant oral statement" is discoverable only if the statement in question was made in the course of interrogation by any person that the defendant knew was a government agent. Thus, in effect, the Rule treats reports of oral statements under the standards applicable for oral statements rather than written statements.

31. Government must disclose defendant's "recorded" statements. Statements that are "recorded" are treated as the same as written statements. Another possible sanction is partial exclusion of testimony. For example, the court could exclude any testimony by a complaining witness concerning his initial discription of an assailant due to the loss of [Rough Notes] or other Jenks statements containing the original discription. See Fields, 368 A.2d at 539-40. In People v. Williams, 849 N.E. 2d 962 (NY 2006) The failure to disclose such evidence of innocence violates the due process clause of the 14th Amend. applicable to both state and federal prisoners. See also, United States v. Koskerides, 877 F.2d 1129, 1133 (2d Cir 1989) (Government complied by typewritten memoranda); cf. United States v. Vallee, 380 F.Supp. 2d 11, 12-5 (D. Mass. 2005)

14

— ( original handwritten notes of defendent's statements were subject to discovery, and typed memoranda of same were insufficient. United States v. Akins, 2016 U.S. Dist. Lexis 11517, at 15 n. 5 (W.D. PA Feb 1 2016) ( rough notes of law enforcement agents generally are not discoverable unless these notes constitute the "Substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent.)

32. Incorporation of the notes in to police reports does not relieve the government of it's obligation to produce the original notes. United States v. Bundy 472 F.2d. 1266, 1267 (DC. Cir. 1972). United States v. Lewis, 511 F. 2d 798, 802 (DC. Cir 1975) ( defendant's oral statement communicated to police are discoverable) United States v. Layton, 564 F. Supp 1391, 1395-96 (D. Or. 1983) ( holding government must disclose all evidence already [within the defendant's] knowledge)

33. Prosecutorial suppression of exculpatory evidence will justify a new trial. Under the landmark decision in Brady v. Maryland, the prosecution has a constitutional obligation to turnover to the defendant evidence in its possession that is both favorable to the defendant and material to the issue of guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194 10 L. Ed. 2d 215 (1963)

34. The failure to disclose evidence that is clearly exculpatory is a violation of due process that entitles the defendant to new trial, regardless of whether the defendant has asked for it by specific discription, made a general request for disclosure of exculpatory evidence, or failed to make any request at all. United States v. Agurs, 427 U.S. 97, 110, 96 S.Ct 2392, 49 L.Ed 2d 342 (1976) ("there are situations in which evidence is obvious of such [ substantial value to the defense ] that elementry fairness requires it to be disclosed even without a specific request.")

35. On the other hand, the prosecution has no duty to disclose it's entire files on the mere speculation that something might be considered possibly exculpatory. This is clearly not one of those instances. The Non-Disclosure of the very specific evidence justifies a new trial or at the minimum an evidentiary hearing to get to the bottom of what happened to those hand written notes of the defendents interrogation by the two agents on 12/7/2006. Non-Disclosure justifies a new trial only for exculpatory evidence that is material to the issue of guilt or innocence, if it "creates reasonable doubt that did not otherwise exist." Agurs, Supra, 427 U.S. at 111-113 ("the ommission must be evaluated in the context of the entire record if there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for new trial") In this case the agent had to purjur his own testimony to hide this evidence, the government would have no case against Tatar

12

— if it wasn't for the suppression of the evidence that that Tatar provided his co-defendant's telephone number to the Agents in question. Sure, Tatar was dishonest about giving the map to Omar (the Informant), this goes back to the agent's predisposition as to the reason of their interrogating Tatar, instead of interviewing him, like a person who was reporting a real crime. Tatar's mens rea, was clear that he did not want to be misconstrued as a potential terrorist simply because of being a muslim or having had simple minded associates who loosely talked about extremely grave matters. In his mind that was exactly what Agent Rycek was acting like and due those "Professional Interrogation Techniques" Tatar was placed under duress and made to lie about the map even though his sole intention was to help the law-enforcement stop a terrorist Attack. <u>Rhode Island</u> v. <u>Innis</u>, 446 U.S. 291, 100 S.Ct. 1082 (1980) (The Supreme Court has held that, for purposes of the Fifth Amend right against self incrimination, interrogation includes not only express questioning but also words or actions that [ the police should know are reasonably likely to elicit an incriminating response.]) (emphasis added.).

36. Thus, the defendant can clearly demonstrate that the evidence is not only newly discovered, but that it is exculpatory in nature as well as the prosecution having suppressed it

calls for a new trial. The court would be satisfied if it holds a hearing, and the court has a very wide discretion in this matter, the defense intends to bring forth evidence that will leave no wiggle room for the prosecution except to conceed to re-tri the defendant. See United States v. Douglas, 874 F.2d 1145, 1163-1164 (7th Cir 1989) (whether evidence is actually exculpatory is threshold question determined before materiality). In order to prevail on a motion for new trial, the defendant must first show that it has newly discovered evidence that was withheld by the prosecution and that it is exculpatory. See, Douglas, supra. Next, the defendant must show that the undisclosed evidence is material. An undisclosed evidence is material only if there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the proceeding would have been diffrent. See United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (a reasonable probability is probability sufficient to undermine confidence in the outcome); see. eg. United States v. Doe, 2013 U.S. App. Lexis 2193, at *42 (9th Cir. Jan 31, 2031) (to grant defendant new trial on Brady violation, court must determine that documents, if favorable to defendant, undermined it's confidence in outcome and that there was "reasonable probability of diffrent result [citing U.S. v. Bagley.]) See Also United States v. DeLeon, 2020 U.S. Dist Lexis 9688, at 201 (D. N.M Jan. 21. 2020).

18

37. This materiality standard is considerably relaxed from the other standard discussed above, that applies in the ordinary motion for a new trial that is based on newly discovered evidence. The defendant does not have to show that the undisclosed exculpatory evidence has a 'high probability of producing a different result in a new trial, but only whether the evidence creates some reasonable doubt that would otherwise not exist. Particularly if the verdict is already of questionable validity, " additional evidence of relatively minor importance might be sufficient to create reasonable doubt. ( Citing United States v. Agurs, 427 U.S. 97, 110, 96 S. Ct. 2392, 49 L. Ed. 2d 215 (1963). Furthermore, unlike the normal, new-evidence new trial motion, the type of new evidence that will justify a new trial is not limited to evidence directly affecting guilt or innocence. Undisclosed evidence that goes only to the [credibility] of a witness may be sufficient to justify a new trial. See e.g. Giglio v. United States, 405, 150, 154, 92 S.Ct. 763, 31 L.Ed 2d 104 (1972); ( when the reliability of a given witness may well be determined of guilt or innocence; non-disclosure of evidence affecting credibility falls within this general rule).

38. The defendant has clearly established the existence of suppressed evidence, and there is enough contention of material fact that the court should at the minimum hold an eviden-

~ tiary hearing. Suppressed exculpatory evidence and government use of purjused testimony violates Due Process and required reversal of a conviction based upon prosecutorial failure to disclose evidence, that had the evidence been disclosed to the defense the outcome undoubtedly would have been different. See, Borg Warner Inc. v. Honeywell Iint'lInc., 750 F. Supp 2d 580 605 (W.D.N.C. 2010) ("Burden is on the non producing party to show substantial justification or harmlesness"); Ricts v. BME2'Inc.com, LLC, 727 F. Supp 2d 936, 950 (D. New 2010) (Party facing sanction bears the burden of proving harmlessness)

39. To prove a Brady violation, a defendant must show the evidence at issue meets three critical elements, First, the evidence "Must be favorable to the accused, either because it is exculpatory, or because it is impeaching." Id. at 281-82, see also United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L. Ed 2d 481 (1985) ("Impeachment evidence ..., as well as exculpatory evidence falls within the Brady Rule.") Tatar meets both this critiria. Second, it {834 F.3d 283} "must (show that) evidence have been suppressed by the State, either willfully or inadvertently." Strickler, 527 U.S. at 282. Third the evidence must have been material such that prejudice resulted from supression. Id.; See also Banks, 540 U.S. at 691. The "touchstone of materiality is 'a reasonable probability' →

→ of a diffrent result". <u>Kyles</u>, 514 U.S. at 434.
Materiality "does not require demonstration by preponderence that
disclosure of the suppressed evidence would have resulted ultimately
in the defendant's acquittal ... [Rather], [a] 'reasonable probability'
of a diffrent result is ... drawn when the government's evidentiary
suppression undermines confidence in the outcome of the trial.
Id. (internal quotations marks ommitted). The prosecution is
ethically bound to provide such <u>Brady</u> material upon request, and
a continuing obligation to disclose exists from the time of trial
preparation up to and including the trial. The prosecutor is held
to a high standard in this regard. Under <u>Brady</u>, evidence favorable
to the accused must be provided by the prosecution to the
defense, without regard to the prosecutors good faith or [bad
faith] in knowing that <u>Brady material</u> exists. This rule is
a strict requirement. It is as much the responsibility of the
prosecutor to ascertain the existance of Brady material as it is
to disclose known Brady material to the defense, for failure to
to do either is treated equally in terms of violation of this
legal and ethical mandate. What this should mean ofcourse,
is that, the defense, for failure of the prosecutor, would be entitled
as a matter of right, to receive all evidence tending to
establish the innocence of the defendant, or new trial in this case.
40. The prosecutor has an affirmative obligation to provide the
defendant with Brady Information. The failure to disclose such eviden

→ of innocence violates the Due Process Clause of the Fourteenth Amendment and applies to state as well as the federal proceeding. People v. Williams, 849 N.E. 2d 962 (N.Y. 2006) (applying Brady rule to evidence material to ruling in suppression motion). The remedy for failure to adhere to the Brady standards is a dismissal of the charges or a reversal of the conviction. However courts are generally flexible in assessing claims of Brady violations, and do not utilize a per se analysis, rather, the courts examine the assertion in the context of the case. For example, if late government disclosure of a document does not prejudice a defendant, the ruling should not constitute reversible error. United States v. Garner, 507 F. 3d 399 (6th Cir 2007) (late disclosure of cell phone records constituted prejudice where defendant was unable to adequately investigate the case.) Additionally, a Brady violation claim should be made in good faith and should be a legitimate assertion of a denial of defendant's rights. (United States v. Monthei, 979 F. 2d 124, 126-127 (8th Cir. 1992) (Failure to provide defendant with notice prior to oral statement between defendant and cooperating witness, which consisted of a one word obscene greeting did not constitute Brady violation).

41.  In United States v. Agurs, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the Supreme Court defined the standard to be used in determining whether the prosecution's failure to →

22

disclose unrequested exculpatory material constituted a denial of the Due Process Clause of the Fifth and Fourteenth Amendments. The Court held that the key issue was whether the ["omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.] Agurs, supra. The Court determined the standard of materiality of evidence which, when not disclosed, would require a reversal even though no request was made, as follows:

"[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire records. If there is no reasonable doubt about guilt, whether or not the additional evidence is considered, there is no justification for new trial [On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."]

42. Due Process requires reversal of a conviction based upon prosecutorial failure to disclose exculpatory evidence if the court determines the evidence is material, that is, if there is reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability is a probability sufficient to undermine the confidence in the outcome.'

22

43. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Catlet v. United States*, 545 A.2d 1202, 1217 (DC 1988). This standard applies whether the favorable evidence is [directly exculpatory], or [may be used to impeach government witness.] In this case that would be Agent Rycek and Agent Brennan. *Bagley*, 473 U.S. at 676; *Giglio v. United States*, 405 U.S. 150, 154 (1972). An especially rigorous standard of review applies when the government [offers] knowingly, false testimony. "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelyhood that false testimony could have affected jury's verdict" *Bagley*, 473 U.S. at 679 n.9 (citing *Napue v. Illinois*, 360 U.S. 264 (1959) and comparing this standard to the "harmless beyond reasonable doubt" test for constitutional error under *Chapman v. California*, 386 U.S. 18 (1967)). In *United States v. Ramos*, 27 F.3d 6. (oct 25 1993) (unless a defendent is able to raise at least a colorable claim that the investigators discarded rough notes contained evidence favorable to him and [material to his claim of innocence] or to the applicable punishment — and that such exculpatory evidence has not been included in any formal interview report provided to defendant — no constitutional error of violation of due process will have been established.

44. After the jury was sequestered for the verdict, they took 6 (six) days to return a guilty verdict. According to a member —

24

— of the jury who returned a guilty verdict against the defendant, Serdar Tatar, [Juror No. 3] She said to a reporter that " We were convinced that the Duka brothers and Shenewer were guilty and it didn't take us long at all to reach a verdict, it was Tatar who we took this long, he seemed to be stuck between the two worlds, we were surprised he didn't testify ... we wanted to hear from him. [Juror No. 3]

45. Had the Government Attorney's not committed SPOILA-TION of the evidence (the hand written notes of Sean Brennan), or had the responsible agent[s] not maliciously ommitted relevant material evidence from the 302 Report (of 12-7-2006 of Tatar), or had Jay Ryack (JTTF) not PURJURED his testimony while being under oath, or had the U.S. Attorney's (the Government) not committed FRAUD UPON THE COURT, and the Jury, the Jurors' decisions respectively very likely could have been a different outcome.

Wherefore, Defendant moves this Honorable Court, in the name of Justice, based upon all of the forgoing, to Order an Evidentiary Hearing with the presence of defendant and allow the defense to present further evidence, Order an Appointment of Consel to assist defendant for the compelex issues involved, and the defendant cannot afford to hire a private attorney, all of which will Justify to Court the Grant of the Motion for a New Trial Order.

25

Respectfully Submitted,

Serdar Tatar, Pro-Se

## Certificate of Service

I, Serdar Tatar, pro-se, sent this and true and correct copy of the 25 page + 1 page Motion to the Clerk of the Court, located at United States District Court, District of New Jersey, 401 Market St, P.O. Box 2797, Camden, New Jersey 08101 to file in the docket via First Class Mail, U.S. Postal Service and also sent to: Norman Gross (A.U.S.A), Office of the US Attorney, 401 Market St. Camden, New Jersey 08101, executed this the 28th day of December 2020 in the absence of Notary Public.

Serdar Tatar, Pro-se

26

<u>United States District Court</u>
<u>District of New Jersey</u>
<u>(CAMDEN)</u>

|  |  |
|---|---|
| United States of America | ( |
|  | ( <u>AFFIDAVIT IN SUPPORT</u> |
| v. | ( <u>OF THE MOTION</u> |
|  | ( |
| SERDAR TATAR | ( Case no: 07-459, Honorable |
| Defendant, | ( Robert B. Kugler |
|  | ( ( 4 Page Document ) |

<u>AFFIDAVIT</u>

I, Serdar Tatar, Pursuant to and under the penalty of perjury, of the laws of the United States of America, 28 U.S.C. § 1746, do swear that all of the forging and following are true and accurate.

1. On or about 12/7/2006, I was interrogated by two agents of the United States at 1500 Cecil B. Moore st. Philadelphia PA.

2. The specific questions were about the individual name Omar who, unknown to me was an informant for the FBI, and was recording our conversations.

1 of 4

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/07/2006

Serdar Tatar, born ▓▓▓▓▓▓, social security number
▓▓▓▓▓▓, Pennsylvania operators number 28167458, contact number
856 520-4291 (cell), residing with wife, Khalida Mirzayeva, at
their rented apartment located at 2100 Tremont Street,
Philadelphia, Pennsylvania was interviewed at his place of
employment, 1500 Cecil B. Moore Street in Philadelphia,
Pennsylvania. After being advised of the identity of the
interviewing TFO and the nature of the interview, Tatar provided
the following information.

In late August 2006, Tatar met a Muslim brother by the
name of Omar, described as Middle Eastern, 6' tall, about 180lbs.,
brown eyes, shaved head and clean shaven face, at the Palmyra
Mosque located in New Jersey. Tatar does not know much about Omar
other than his phone number, 856 669-1233, and that he drives a
dark gray or black BMW 328I with a New Jersey license plate. He
knows that Omar is married with a child, but does not know where he
lives. Tatar has never been to Omar's house, but believes that it
is in New Jersey.

Tatar learned of Omar's business of purchasing
automobiles at auction and sending them oversees for a profit.
Tatar became interested in this business, often discussing it with
Omar. Tatar informed Omar that he had been working with his father,
Muslim Tatar, at the family's owned Italian restaurant, Super
Marios, located in Cookstown, New Jersey, across from the Fort Dix
Military Base. Tatar conveyed that a large part of the business
consisted of delivery sales to the base.

Shortly thereafter, Omar questioned Tatar about the
deliveries, asking if he had a map of the base complex. Tatar
stated that he did, but asked why, even though Omar suggested some
type of terrorist attack. Omar asked Tatar if he wanted to be part
of this attack, but Tatar stated no.

Tatar stated that even though he was asked for the map
several times since September 2006, he has not given it to Omar.
The most recent request for the map was on November 28, 2006, while
traveling to an automobile auction with Omar in New Jersey, off of
Route 55. Tatar recorded this request on his cell phone because he
does not trust Omar, fearing that he may be a law enforcement

00169

Investigation on    12/07/2006    at    Philadelphia, Pennsylvania

File #                                                    Date dictated    12/07/2006

      TFO Jay Ryce▓▓▓▓
by    TFO Sean Brennan

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

D0004426

| 06/06/2007 | | Notice of Allocation and Assignment to Hon. Robert B. Kugler as to MOHAMAD IBRAHIM SHNEWER, DRITAN DUKA, ELJVIR DUKA, SHAIN DUKA, SERDAR TATAR, AGRON ABDULLAHU (lc) (Entered: 06/06/2007) |
|---|---|---|
| 06/06/2007 | | Setting Hearing as to MOHAMAD IBRAHIM SHNEWER, DRITAN DUKA, ELJVIR DUKA, SHAIN DUKA, SERDAR TATAR, AGRON ABDULLAHU: Arraignment set for 6/14/2007 @ 02:00 PM before Magistrate Judge Joel Schneider. (lc) (Entered: 06/06/2007) |
| 06/14/2007 | 24 | Minute Entry for proceedings held before Judge Joel Schneider :Arraignment as to SERDAR TATAR (5) Count 1 held on 6/14/2007, Plea entered by SERDAR TATAR Not Guilty on counts 1. Ordered deft remanded (Court Reporter Carl Nami.) (th, ) (Entered: 06/15/2007) |
| 06/14/2007 | 26 | ORDER for Discovery and Inspection as to MOHAMAD IBRAHIM SHNEWER, DRITAN DUKA, ELJVIR DUKA, SHAIN DUKA, SERDAR TATAR, AGRON ABDULLAHU. Signed by Judge Joel Schneider on 6/14/07. (th, ) (Entered: 06/15/2007) |
| 06/14/2007 | 27 | Minute Entry for proceedings held before Judge Robert B. Kugler :Status Conference as to MOHAMAD IBRAHIM SHNEWER, DRITAN DUKA, ELJVIR DUKA, SHAIN DUKA, SERDAR TATAR, AGRON ABDULLAHU held on 6/14/2007 (Court Reporter Carl Nami, Jr..) (th, ) (Entered: 06/15/2007) |
| 06/20/2007 | 33 | Letter from Richard Sparaco, Esq., Attorney for Serdar Tatar (SPARACO, RICHARD) (Entered: 06/20/2007) |
| 07/09/2007 | 36 | MOTION For The Impanelment Of An Anonymous Jury by USA as to MOHAMAD IBRAHIM SHNEWER, DRITAN DUKA, ELJVIR DUKA, SHAIN DUKA, SERDAR TATAR, AGRON ABDULLAHU. (Attachments: # 1 Brief In Support Of Motion# 2 Exhibit A# 3 Text of Proposed Order # 4 Certificate of Service)(STIGALL, ROBERT) (Entered: 07/09/2007) |
| 07/09/2007 | 37 | MOTION For The Entry Of A Complex Case Order by USA as to MOHAMAD IBRAHIM SHNEWER, DRITAN DUKA, ELJVIR DUKA, SHAIN DUKA, SERDAR TATAR, AGRON ABDULLAHU. (Attachments: # 1 Brief In Support Of Motion# 2 Text of Proposed Order # 3 Certificate of Service)(STIGALL, ROBERT) (Entered: 07/09/2007) |
| 07/09/2007 | 38 | TRANSCRIPT of Proceedings as to MOHAMAD IBRAHIM SHNEWER, DRITAN DUKA, ELJVIR DUKA, SHAIN DUKA, SERDAR TATAR, AGRON ABDULLAHU held on JUNE 14, 2007 before Judge KUGLER. Court Reporter: CARL J. NAMI. PLEASE NOTE: The complete transcript of these proceedings is maintained in paper format on file in the Clerks Office. To request copies of this transcript, contact the Official Court Reporter or Transcription Service who prepared the transcript. (lc) (Entered: 07/12/2007) |

| 06/12/2008 | 166 | Letter from Serdar Tatar to Judge Kugler. (th, ) (Entered: 06/17/2008) |
|---|---|---|
| 06/19/2008 | 168 | NOTICE OF ATTORNEY APPEARANCE NORMAN JOEL GROSS appearing for USA. (GROSS, NORMAN) (Entered: 06/19/2008) |
| 06/19/2008 | 170 | First MOTION to Suppress *Evidence* by SERDAR TATAR. (Attachments: # 1 Brief in Support of Motion to Suppress Evidence, # 2 Exhibit A - Superseding Indictment filed 1-14-08, # 3 Exhibit B - 302 dated 7-31-06 - Search of Defendant's Car, # 4 Exhibit C - 302 dated 12-7-06, # 5 Exhibit D - 302 re Circuit City employee, # 6 Exhibit E - Segment from Complaint, # 7 Exhibit F - Receipt for Property Received (Shnewer), # 8 Exhibit G - Search Warrant Affidavit, # 9 Exhibit H - Search Warrant, # 10 Exhibit I - 302 re Search of Residence, # 11 Exhibit J - Search Warrant Return - 2100 Tremont St., Philadelphia (Serdar Tatar), # 12 Exhibit K - 302 dated 3-21-07 re Sean Dandridge, # 13 Exhibit L - Photos from Search of Residence, # 14 Certification Exhibit M - Certification of Serdar Tatar, # 15 Certification Exhibit N - Certification of Counsel in Support of Motion to Suppress)(SPARACO, RICHARD) (Entered: 06/19/2008) |
| 06/19/2008 | 171 | Second MOTION to Suppress *Evidence - Foreign Intelligence Surveillance Act* by SERDAR TATAR. (Attachments: # 1 Brief in Support of Motion to Suppress FISA Evidence, # 2 Exhibit A - Notice of Intent to Use Foreign Intelligence Surveillance Act Information 10-11-07, # 3 Exhibit B - Letter from Government with Wiretap Audio of ST to MS and of ED to UM.pdf, # 4 Exhibit C - Protective Order for Classified Material, # 5 Exhibit D - Page from Shnewer Search Warrant Affidavit - Par. 18, # 6 Exhibit E - Page from Shnewer Search Warrant Affidavit - Par. 31, # 7 Exhibit F - Page from Shnewer Search Warrant Affidavit - Par. 59, # 8 Exhibit G - Certification of Serdar Tatar)(SPARACO, RICHARD) (Entered: 06/19/2008) |
| 06/19/2008 | 172 | First MOTION for Release of Brady Materials by SERDAR TATAR. (Attachments: # 1 Brief in Support of Motion for Brady Materials, # 2 Exhibit Exhibit A (FD-302 dated 12-7-06), # 3 Exhibit B (FD-302 dated 3-21-07))(SPARACO, RICHARD) (Entered: 06/19/2008) |
| 06/19/2008 | 173 | First MOTION to Exclude *of Co-Defendant Statement* by SERDAR TATAR. (Attachments: # 1 Brief in Support of Motion to Exclude Evidence of Co-Defendant Statement, # 2 Exhibit A - Letter from US Attorney, # 3 Exhibit B "Fishing" Letter (front and back), # 4 Exhibit C - Reports of FDC Personnel)(SPARACO, RICHARD) (Entered: 06/19/2008) |
| 06/19/2008 | 174 | First MOTION to Strike *Surplusage* by SERDAR TATAR. (Attachments: # 1 Brief in Support of Motion to Strike Surplusage)(SPARACO, RICHARD) (Entered: 06/19/2008) |
| 06/19/2008 | 175 | MOTION Join in Codefendants' Pretrial Motions by SERDAR TATAR. (SPARACO, RICHARD) (Entered: 06/19/2008) |
| 07/01/2008 | 185 | Letter from Serdar Tatar addressed to Judge Kugler (Dated 6/21/08) (lc) Modified on 7/2/2008 to reflect that letter was received in chambers on |

| | | (Attachments: # 1 Certificate of Service)(GROSS, NORMAN) (Entered: 07/18/2008) |
|---|---|---|
| 07/18/2008 | 192 | BRIEF in Opposition by USA as to MOHAMAD IBRAHIM SHNEWER, DRITAN DUKA, ELJVIR DUKA, SHAIN DUKA, SERDAR TATAR, AGRON ABDULLAHU re 177 First Omnibus MOTION *[PRETRIAL]*, 167 First Omnibus MOTION *UNITED STATES' OPPOSITION TO: (A) DRITAN DUKA'S MOTION TO SEVER COUNTS ONE AND TWO FROM COUNTS THREE AND FIVE THROUGH SEVEN; (B) DRITAN DUKA'S ALTERNATIVE MOTION FOR SEVERANCE OF ALL OF THE CHARGES AGAINST HIM IF THE COURT DENIES HIS MOTION TO EXCLUDE A POST-ARREST LETTER WRITTEN BY ELJVIR DUKA; AND (C) ELJVIR DUKA'S MOTION TO SEVER ALL OF THE CHARGES AGAINST HIM FROM THE CHARGES AGAINST HIS CO-DEFENDANTS* (Attachments: # 1 Certificate of Service)(GROSS, NORMAN) (Entered: 07/18/2008) |
| 07/18/2008 | 193 | BRIEF in Opposition by USA as to MOHAMAD IBRAHIM SHNEWER, DRITAN DUKA, ELJVIR DUKA, SHAIN DUKA, SERDAR TATAR, AGRON ABDULLAHU re 179 First MOTION to Suppress *FISA Electronic Surveillance*, 176 First Omnibus MOTION, 173 First MOTION to Exclude *of Co-Defendant Statement UNITED STATES' OPPOSITION TO: (A) SHNEWER'S, TATAR'S AND DRITAN DUKA'S MOTIONS TO REDACT OR EXCLUDE ELJVIR DUKA'S INCRIMINATING POST-ARREST LETTER; (B) SHNEWER'S MOTION TO REDACT OR EXCLUDE TATAR'S POST-ARREST STATEMENT TO LAW ENFORCEMENT OFFICIALS; (C) SHNEWER'S MOTION TO REDACT TATAR'S PRE-ARREST STATEMENTS; (D) DRITAN DUKA'S MOTION FOR A PRE-TRIAL EVIDENTIARY HEARING REGARDING THE ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS; AND (E) SHAIN DUKA'S MOTION TO ADMIT EVIDENCE OF PRIOR BAD ACTS OF PROSECUTION WITNESSES* (Attachments: # 1 Certificate of Service)(GROSS, NORMAN) (Entered: 07/18/2008) |
| 07/18/2008 | 194 | BRIEF in Opposition by USA as to MOHAMAD IBRAHIM SHNEWER, DRITAN DUKA, ELJVIR DUKA, SHAIN DUKA, SERDAR TATAR, AGRON ABDULLAHU re 177 First Omnibus MOTION *[PRETRIAL]*, 172 First MOTION for Release of Brady Materials, 179 First MOTION to Suppress *FISA Electronic Surveillance*, 176 First Omnibus MOTION *UNITED STATES' OPPOSITION TO: (A) SHNEWER'S MOTION TO DISCLOSE RULE 404(b) EVIDENCE; (B) SHNEWER'S AND ELJVIR DUKA'S MOTIONS FOR THE PRESERVATION OF "ROUGH NOTES" OF INTERVIEWS; (C) SHNEWER'S MOTION TO PRODUCE BRADY, GIGLIO, AND JENCKS MATERIAL; (D) TATAR'S MOTION TO DISCLOSE BRADY MATERIAL AND ELJVIR DUKA'S MOTION TO DISCLOSE BRADY, GIGLIO, AND KYLES MATERIAL; (E) ELJVIR AND SHAIN DUKA'S MOTIONS FOR EXPERT DISCLOSURE; AND (F) SHAIN DUKA'S MOTION TO DISCLOSE CONTACTS BETWEEN GOVERNMENT AGENTS AND GOVERNMENT INFORMANTS* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 |

49

1  at as impossibilities because of the only constant
2  observations of my external sight, and were simply because
3  their own interests in dispositions.
4          I am sure that the expression damned if you do and
5  damned if you don't, is a very familiar one to everyone here.
6  I command, your Honor, no good lawyer means any bush in any
7  and every applicable way.
8          Today I announce with the leave of your Honor, to
9  everyone who is listening, especially yourself, Mr.
12:44PM 10  Fitzpatrick and Mr. Hammer, to the respective President of the
11  United States, Barack Obama and to the whole world, including
12  the leaders of my country, I disclaim, denounce and disown any
13  belief that teaches, uses or implicates violence in any
14  situation or form to establish any good.
12:44PM 15          What I believe is violence is a last resort over
16  incompetence, and I don't believe anyone here would argue
17  contrary to my comments.
18          Further, I submit that I'm not a killer.  And to my
19  surprise everyone already said that, and I did this just
12:45PM 20  yesterday, stayed up all night, only slept two hours.
21          I'm not an extremist, not even close to being a
22  radical, nothing was provided really in my belief, to
23  constitute any attributions to me as a terrorist.
24          I'm a patriot, I love my country.  I love America.
12:45PM 25  And so far there's only one American that I really love, and

*United States District Court*
*Camden, New Jersey*

50

1  that's my son, Jama (ph) he's not here today.
2          I consider myself to be an American despite the
3  technicalities and I always will be.  I truly value the
4  direction that I believe and understand this country and it's
12:45PM 5  citizens are aiming for.  I'm with you 100 percent America.
6  I'm not a terrorist.
7          No matter the shortcomings and mistakes of our
8  leaders, and the ignorant, I'm with you, in keeping safe our
9  freedom and liberties.  I'm hit with the belief of fighting
12:46PM 10  for the greater good of the people.
11          This country and any who loves in it are not my
12  enemies, as the Government wants all to believe that I am.
13  This Government doesn't know me; you guys don't know me, you
14  guys don't know who I am (directed at U.S. Attorneys).
12:47PM 15          And I'm here to tell you that I am not a terrorist,
16  again.  I believe in diplomacy, and I am not a jihadist.  I
17  believe in the judicial system set to litigate and educate,
18  and make change and make a difference.  I am not part of the
19  problem, I promise I will, I am, and I will continue to be
12:47PM 20  part of the solution.
21          I made a huge mistake and I lied to the FIB agents,
22  I admitted that the first day I met with my attorney.  I lied
23  twice because it was the same person who interviewed me in the
24  first place, who then wanted the information I was trying to
12:47PM 25  give him.

*United States District Court*
*Camden, New Jersey*

51

1          Excuse me.
2          The huge mistake I made was to lie to the FBI about
3  giving the map.  And I'm really sorry for doing, for all that
4  I'm going through and all that everyone is going through, I'm
12:48PM 5  very sorry.  That this is all happening just because my
6  stupid-ass lie about a freaking map.
7          But I do reflect that on the day Mr. Brennan and Mr.
8  Rycek interviewed me, I told them both that I would do
9  anything to stop what I thought was really going to be a
12:49PM 10  terrorist attack.  I reported the whole incident as to the
11  best of my abilities and my memory.
12          My interview with two agents are not fully reflected
13  on documents.  The information I gave them were not put there.
14  I gave the telephone number of Mohamad Shnewer to the FBI
12:49PM 15  agents, as I wrote to you in the letter.  I don't know why
16  it's not there.
17          In my interview -- I'm sorry.  I was afraid and
18  that's why I lied.  I was almost going to shut myself; excuse
19  my language.  I was scared of exactly what's going on today,
12:50PM 20  exactly what I'm going through today.  This is what I was
21  afraid of.
22          Ever since 9/11 happened a lot of the Muslims that
23  lives in this country has went through great duress, and under
24  -- have been under great pressure, just -- just to observe
12:50PM 25  basically part of their religion.  And being -- you know,

*United States District Court*
*Camden, New Jersey*

52

1  attending Friday prayers and so on.
2          People are afraid to be blamed for what other people
3  committed.  This is what's happening today.  I tried to change
4  that view, and that was one of my goals; I wanted to change
12:50PM 5  that view of the people that there is a collateral fight
6  against terrorism, and I wanted to be part of it.
7          I wanted to show not just the -- not to be a
8  celebrity, not to be just somebody just to make a big show of
9  it, but to show that, you know, Muslims care too and we're
12:51PM 10  human beings that value life.
11          I don't mean in any way to disrespect the decisions
12  that the jury arrived at, but I contend and beg with all the
13  humility and deep anguish, those actions I took and the things
14  that I said were not done in -- with any malice in my heart or
12:51PM 15  mind.
16          I did what I did and the things that I said were
17  done in complete utter ignorance of what was really going on.
18  I had no idea what Shnewer was doing and saying to Mr. Omar.
19  I had no idea about those gun purchases, about what they were
12:51PM 20  saying about me.  That I don't even remember saying it.  Or
21  being apart of it.
22          I don't know why people observed me the way they
23  observed me, the way they thought I was, but I'm not that
24  person who they thought.  I wish I could just show it and
12:52PM 25  prove it, but other than words I have nothing else to submit

*United States District Court*
*Camden, New Jersey*

4745

1   A.   Nothing.

2   Q.   And what if anything did you know about Serdar Tatar

3   before December 5th, 2006?

4   A.   Nothing.

5   Q.   Now, on December 5th, 2006 what occurred?

6   A.   I was approached by the case agent Jack Ryan, FBI

7   Philadelphia, he informed me that due to the investigation

8   something had come up and he asked me to interview a Sergeant

9   Dandridge from the Philadelphia Police Department.

11:33AM  10   Q.   And so therefore whom did you call on December 5th, 2006?

11   A.   I contacted Sergeant Dandridge by phone and set up an

12   interview. He was not working that day, and we set up the

13   interview for the next morning, December 6th.

14   Q.   And are you aware that Sergeant Dandridge is also a

11:33AM  15   Philadelphia police officer?

16   A.   That's correct.

17   Q.   So did you know Sergeant Dandridge already?

18   A.   No, I did not.

19   Q.   Now, did you get together and speak with Sergeant

11:33AM  20   Dandridge on December 6th, 2006?

21   A.   That's correct.

22   Q.   And as a result of that conversation whom did you speak

23   with?

24   A.   To Serdar Tatar.

11:34AM  25   Q.   And when did you speak with Serdar Tatar?

United States District Court
Camden, New Jersey

4746

1   A.   On the 7th, December 7th.

2   Q.   Where did you speak with Mr. Tatar?

3   A.   At his place of employment, it was the 7-11 store, 15

4   thousand -- or 1500 Cecil B. Moore, in Philadelphia.

11:34AM  5   Q.   And basically what did Mr. Tatar tell you?

6   A.   He informed me that he was being pressured by a male by

7   the name of Omar; he met Omar at the Palmyra mosque in New

8   Jersey. This male by the name of Omar was pressuring him to

9   hand over a map to the Fort Dix base.

11:34AM  10   Q.   And did he tell you how Omar would have known that Serdar

11   Tatar would have a map of Fort Dix?

12   A.   Yes, he -- Tatar told me that he became friendly with

13   Omar and he became -- Tatar became interested in Omar's

14   dealing with automobiles, selling them -- or buying them and

11:35AM  15   selling them for a profit.

16        At that time Tatar had indicated to Omar that he was

17   currently employed at his dad's pizza shop, Super Mario's in

18   New Jersey, and he worked there and that he made deliveries

19   for his dad, which consisted of deliveries to the Fort Dix

11:35AM  20   base.

21   Q.   And what if anything did Serdar Tatar tell you about what

22   Mr. Omar had told him as to why he was asking about the map?

23   A.   Tatar indicated that Omar suggested that doing something

24   bad to the base, some kind of terrorist related act.

11:35AM  25   Q.   And did you ask Mr. Tatar if he gave the map to Mahmoud

United States District Court
Camden, New Jersey

4747

1   Omar or anyone else?

2   A.   Yes, I did, several times, three times during the

3   interview, I asked Tatar if he had given the map to Omar, any

4   other person or left it, and he indicated no, in all three

11:36AM  5   times.

6   Q.   And again this interview was when, your interview of Mr.

7   Tatar?

8   A.   It was -- it was on the 7th of December, 2006.

9   Q.   And did you ask Mr. Tatar whether as far as he knew

11:36AM  10   anyone else was involved in the attack?

11   A.   Yes, I did. He indicated that the only person he knew

12   that was involved in this attack on the base was Omar. He

13   said he had no knowledge of any associates of Omar.

14   Q.   Did Mr. Tatar tell you he was concerned that Mr. Omar was

11:36AM  15   from immigration or another law enforcement agency?

16   A.   Yes, he did.

17   Q.   And what did Serdar Tatar tell you he was afraid Omar was

18   trying to do to him if he was from such an agency?

19   A.   He told me that he believed that Omar was some law

11:37AM  20   enforcement agent, attempting to deport him.

21   Q.   What if anything did Mr. Tatar say about him offering the

22   map to Mr. Omar?

23   A.   He indicated he never turned the map over to Omar.

24   Q.   And what if anything did Mr. Tatar tell you about him

11:37AM  25   offering up information concerning a power station at Fort

United States District Court
Camden, New Jersey

4748

1   Dix?

2   A.   Nothing.

3   Q.   What if anything did Mr. Tatar tell you about an

4   individual named Mohamad Shnewer?

11:37AM  5   A.   Nothing.

6   Q.   After this interview, what if any information did you

7   give Mr. Tatar in case he had other information to report to

8   you?

9   A.   I gave him the main phone number to the FBI in

11:37AM  10   Philadelphia; I gave him my direct line in the office; and I

11   also gave him my direct cell phone number.

12   Q.   Did Mr. Tatar ever call you after this December 7th, 2006

13   interview?

14   A.   No.

11:38AM  15   Q.   But did there come a time later where you interviewed Mr.

16   Tatar again?

17   A.   That's correct.

18   Q.   When was that?

19   A.   That was on May 7th, 2007.

11:38AM  20   Q.   And how is it that you came to interview Mr. Tatar on May

21   7, 2007?

22   A.   Pursuant to an arrest warrant of Mr. Tatar.

23   Q.   So were you one of the arresting agents for Mr. Tatar?

24   A.   That's correct.

11:38AM  25   Q.   And where did you and the other agents arrest Mr. Tatar?

United States District Court
Camden, New Jersey

4757

1   A.   No.

2   Q.   Now, when you interviewed Sergeant Dandridge you

3   telephoned Sergeant Dandridge and said come on down to

4   Philadelphia police station -- I'm sorry, the FBI office in

5   Philadelphia, we need to talk to you?

6   A.   That's correct.

7   Q.   You invited him down there; correct?  And you arranged

8   for him to come?

9   A.   That's correct.

10   Q.   You didn't go over to the Philadelphia Police precinct

11   where he was working and question him there; did you?

12   A.   No, I did not, he -- he indicated that he was on day work

13   that day, and would like to come in that day to talk to me.

14   Q.   And the following day December 7th, instead of inviting

15   Mr. Tatar down to the Philadelphia FBI office, you decided to

16   go to the 7-11 and interview him at the 7-11 where he works;

17   correct?

18   A.   That's correct.

19   Q.   Now, when you went there did you bring any recording

20   device with you?

21   A.   No.

22   Q.   And did -- you were with another agent at the time;

23   correct?

24   A.   Another task force officer, correct.

25   Q.   Task Force Officer Sean Brennan?

*United States District Court*
*Camden, New Jersey*

4758

1   A.   That's correct.

2   Q.   To your knowledge did Sean Brennan have a recording

3   device with him?

4   A.   No, he did not.

5   Q.   But you had these recording devices available to you at

6   any time at your disposal that you can bring with you to the

7   interview and record what goes on between you and the

8   interviewee; correct?

9   A.   They're available, it's not a standard practice in all

10   investigations.

11   Q.   All right.  This is not a standard practice when you're

12   interviewing a witness who may be coming to tell you something

13   about a crime that might be involved; correct?

14   A.   That's correct.

15   Q.   But this is not your usual situation, this is not someone

16   who you believe is going to tell you honestly that they

17   believe about a terror attack, you believe that this is a

18   suspect that the FBI is investigating; correct?

19   A.   That's correct.

20   Q.   All right.  So this is a very unusual situation that may

21   allow you to divert from the policy that you don't record

22   interviews; correct?

23   A.   I guess that's true.

24   Q.   Okay.  And would you agree that if there were a recording

25   made of the interview of Serdar Tatar, that today this jury

*United States District Court*
*Camden, New Jersey*

4759

1   could hear that interview on tape or on video; correct?

2   A.   That's correct.

3   Q.   And instead of listening to an audio or looking at a

4   video of what your questions were, and what Mr. Tatar's

5   answers were, today we have to rely on what you remember two

6   years ago; correct?

7   A.   That's correct.

8   Q.   Okay.  But your memory is helped or refreshed by your

9   notes and your reports; correct?

10   A.   Absolutely.

11   Q.   And you today have to rely upon what you wrote in your

12   report versus what your specific recollection is of what

13   happened two years ago; correct?

14   A.   I pretty much recall the incident.

15   Q.   Okay.  But now when you went into the interview you asked

16   Mr. Tatar certain questions; correct?

17   A.   Correct.

18   Q.   And the way you answered -- asked him, I'm sorry, the way

19   you asked those questions, are not recorded; correct?

20   A.   That's correct.

21   Q.   And the way Mr. Tatar answered the questions are not

22   recorded; correct?

23   A.   That's correct.

24   Q.   So we don't know his demeanor at this time except for

25   what you may testify to.

*United States District Court*
*Camden, New Jersey*

4760

1   A.   That's correct.

2   Q.   And we don't know what your demeanor would be except what

3   you may testify to; correct?

4   A.   Correct.

5   Q.   The information that Mr. Tatar gave you about Mr. Omar,

6   he gave you his name; correct, Omar?

7   A.   Correct.

8   Q.   He told you his -- well, strike that.

9        He told you about himself first, he told you his name,

10   I'm talking about Mr. Tatar, his name his date of birth;

11   correct?

12   A.   That's correct.

13   Q.   He told you his Social Security -- he told you his Social

14   Security number.

15   A.   Correct.

16   Q.   He gave you his cell phone number.

17   A.   Correct.

18   Q.   He told you his wife's name and his residence.

19   A.   Correct.

20   Q.   He gave all of that information to you voluntarily at

21   this interview; correct?

22   A.   Correct.

23   Q.   He told you that he met a Muslim named Omar at the mosque

24   that he attended.

25   A.   Correct.

*United States District Court*
*Camden, New Jersey*

(3) Eventually, approximately three weeks later, a Joint Terrorist Task Force (hereinafter JTTF) Officer Jay Rycek of the Philadelphia Police Dept., and the F.B.I. Special Agent Sean Brennan showd-up at the 7/11 store.

(4) When the Agents finally appeared Petitioner informed them "first of all, whatever is going on I don't have anything to do with it, other than I want to held stop it." The Agents asked Petitioner what was going on? Petitioner informed them that a guy named Omar approached him and inquired about the Fort Dix Military base and maps related to the base. And he, Omar, spoke something to the effect of wanting the Americans to pay for what they have been doing to Muslims.

(5) Petitioner informed the agents that, as soon as, he heard the statements from Omar his emotional alarms went off (in his head), and he could barely contain himself; thus, he's contacted them, and repeatedly reminded them that he wanted to help them in the matter.

(6) Then Petitioner tried to give the agents a portion of recorded conversation between Omar and himself that he was able to record and preserve on his Cell Phone in order to show the agents it's the "read deal". Petitioner played the small clip for the agents about four times, but the Agent Rycek suddenly appeared/seamed very angry, turning very red in the face—as if he was surprised or not expecting that Petitioner would have recorded the exchange with Omar. There also appeared to be some conflicting/contradictory emotions where the other Agent Sean Brennan appeared more intrigued and amicable to the idea of underlying recording, where he also sought to hear the recording over again.

(7) However, when Agent Brennan was done with listening to the recording, instead of taking it with them as something critical to their investigation, he simply instructed Petitioner not to loose it. Then the agents inquired as to who else was involved in the situation? And Petitioner informed that another guy named Muhammad. Pet. did not know Muhammad's last name, nor where he actually lived, so he simply offered the agents his phone number. And volunteered that he believed the agents should be able to get whatever additional information they needed about the maps from Muhammad. Furthermore, that Muhammad frequented Petitioner's restaurant across from the Military Air Base.

(8) In a strange turn of events, when Petitioner offered Muhammad's number to Agent Rycek, he again produced strange contradictory energy and actions via his facial expressions and overall body language—suggesting he didn't want to take the info. from Pet. In fact, the agent suddenly exhaled "no, no, no, we don't need that right now"! And again there was this awkward silence between the agents and Petitioner. The agents behavior was scaring Petitioner, Particularly where the two agents kept exchanging conflicting looks with each other. And just as Petitioner was about to ask "what's going on here"? Agent Brennan interjected and said: "I'll take that number", and Petitioner immediately gave it to him. The agent wrote the number of one who's now become Petitioner's convicted coconspirator Muhammad Shenewer. Ironically, none of the fore going information has been properly preserved as what is legally known as 302 material, or agents personal notes.

(9) Quite the contrary, the foregoing facts was obfuscated, misrepresented and advanced before the trial court by the prosecution as part of their case-in-chief in the limited context cast as if Petitioner has made up a bunch of lies, e.g., about the maps, or that Petitioner told them he did not know any one was involved in underlying crimes.

-22-

the Fort Dix Military base and maps related to the base. And he, Omar, spoke something to the effect of wanting the Americans to pay for what they have been doing to Muslims.

(5) Petitioner informed the agents that, as soon as, he heard the statements from Omar his emotional alarms went off (in his head), and he could barely contain himself; thus, he's contacted them, and repeatedly reminded them that he wanted to help them in the matter.

(6) Then Petitioner tried to give the agents a portion of recorded conversation between Omar and himself that he was able to record and preserve on his Cell Phone in order to show the agents it's the "real deal". Petitioner played the small clip for the agents about four times, but the Agent Rycek suddenly appeared/seemed very angry, turning very red in the face – as if he was surprised or not expecting the Petitioner would have recorded the exchange with Omar. There also appeared to be some conflicting/contradictory emotions where the other Agent Sean Brenman appeared more intrigued and amicable to the idea of underlying record, where he also sought to hear the record over again.

(7) However, when Agent Brenman was done with listening to the recording, instead of taking it with them as something to their investigation, he simply instructed Petitioner not to loose [sic] it. Then the agents inquired as to who else was involved in the situation? And Petitioner informed that another guy named Muhammad. Petitioner did not know Muhammad's last name, nor where he actually lived, so he simply offered the agents his phone number. And volunteered that he believed the agents should be able to get whatever additional information they needed about the maps from Muhammad. Furthermore, that Muhammad frequented Petitioner's restaurant across from the Military Air Base.

(8) In a strange turn of events, when Petitioner offered Muhammad's number to Agent Rycek, he again produced strange contradictory energy and actions via his facial expressions and overall body language – suggesting he didn't want to take the info. from Pet[itioner]. In fact, the agent suddenly exhaled, "no no, no, we don't need that right now"!

8

65

1  Lied to the FBI. On the other hand, as we've all
2  acknowledged, he was not in the Poconos in the first trip. No
3  evidence he ever owned or viewed the videos. No evidence he
4  spoke to anyone about these particular machine guns. When his
5  home was searched, some nine millimeter ammunition was found
6  as was a rifle scope. Some ear protection and goggles. He
7  was never charged with a weapons offense. There's no evidence
8  he was involved in any surveillance. The government argues
9  that the reason for the difference in quantum of evidence
01:29PM 10  simply because he was not as close to Omar or Bakalli as the
11  other defendants. And I'm realistic enough to know as I
12  mentioned yesterday and that much went on here in this
13  conspiracy that we never heard anything about because there
14  was no opportunity to tape record it. And I don't say that
01:29PM 15  because I think they're guilty for things that I imagine may
16  have happened. It's just that when a lawyer argues that the
17  importance of the absence of some evidence, I sort of take
18  that with a grain of salt.
19       The need for the sentence imposed to reflect the
01:29PM 20  seriousness of the offense, promote respect for the law,
21  provide just punishment for this offense. It is, as I said,
22  the most serious offense that I'm aware of in the Guidelines.
23  Does Mr. Tatar respect the law? Well, he didn't. And he
24  continued to disrespect the law when he lied to the agents.
01:30PM 25  Deterrence. Very serious crime. Deterrence is absolutely

*United States District Court*
*Camden, New Jersey*

66

1  necessary. General and specific. Protect the public from
2  further crimes of the defendant. I'm not so sure that that
3  turns out the same way it did with the other defendants. The
4  other defendants had a much greater sense that they were an
01:30PM 5  immediate and eminent danger to public. Based on what Mr.
6  Tatar said here, that we know about, I could conclude that's
7  true here also.
8       I reviewed the kind of sentences available. I've
9  talked endlessly about the Guidelines. Sentence disparity is
01:31PM 10  not really a factor, and restitution will be ordered for the
11  reasons that has been ordered from the other cases. The
12  government argues for a life sentence. There are significant
13  reasons why they are correct, and the life sentence is called
14  for in this case. But that's not the end of the analysis. I
01:31PM 15  thought long and hard about Mr. Tatar in this case. The
16  Constitution and the laws of the United States give me the
17  power to impose a sentence of life. Simply affixing my
18  signature to a judgment of conviction condemns this man to
19  spend the rest of his life in prison. I have the power to
01:32PM 20  dictate what he does every day for the rest of his life.
21  Enormous power. But with that comes tremendous
22  responsibility. Responsibility to make sure I get it right.
23  Because I don't have the ability, none of us has as judges
24  have the ability to review our sentence in five years,
01:32PM 25  10 years, 20 years, 30 years. We have to get it right, now.

*United States District Court*
*Camden, New Jersey*

67

1  During and after this trial I always got the sense that Mr.
2  Tatar was in a different category than the others. And we've
3  talked about that today. The quantum of evidence is different
4  and it may be as the government says. There just wasn't the
01:32PM 5  connection there just wasn't the connection that the other
6  defendants had. But it was always something more to me and I
7  couldn't put my finger on it. And I read, and I reread, and I
8  reread the Presentence Report and Mr. Sparaco's brief and the
9  letters and I read the Government's brief again and again and
01:33PM 10  I reviewed the evidence and I too stayed up most of the night
11  thinking about this and thinking about what I'm going to say.
12  And I finally put my finger on it. And what was said here
13  today confirmed it. I asked the government the question, what
14  motivated this man. And it's the Government position its
01:33PM 15  religious fervor. And indeed he does say it; I'm doing it in
16  the name of Allah. But that's all he ever really says.
17  That's the only time he ever invokes the name of the Lord.
18  The only time he ever invokes a religious reason, for doing any
19  of this. And I'm not impressed with it. I know a lot of
01:34PM 20  people who invoke the name of their God. Very religious
21  people, and I come away with this, simply not convinced by a
22  preponderance of the evidence that he was driven to do this by
23  any ideology of hatred or any religious fervor. I am
24  absolutely convinced that he was going through with this, he
01:34PM 25  was going to help this, he would do what he can do and to make

*United States District Court*
*Camden, New Jersey*

68

1  this happen. That they were going do kill American soldiers
2  merely because of the status. But what drove him was not what
3  drove the other four defendants in this case. And that makes
4  a difference. It makes a big difference. Because he's the,
01:34PM 5  only one of these defendants who I have any hope of
6  rehabilitating through a prison sentence. The others are so
7  consumed with hatred and their ideology of theirs that they're
8  never going to change. I'm not convinced the same is true of
9  Mr. Tatar.
01:35PM 10       Accordingly, I am not going to give him a sentence of
11  life imprisonment. He's going to be punished severely for his
12  actions and his desires and what he did that led up to his
13  arrest.
14       Therefore, pursuant to the Sentencing Reform Act of
01:35PM 15  1984 it's the judgment of this court, that the defendant,
16  Serdar Tatar, is hereby committed to the custody of the Bureau
17  of Prisons to be imprisoned for a term of 396 months. The
18  math is 33 years. Upon release from imprisonment, the
19  defendant shall being placed on supervised release for a term
01:35PM 20  of the rest of his life. Within 72 hours of release from the
21  custody of the Bureau of Prisons, he shall report in person to
22  the probation office in the district in which he is released.
23  While on release he shall not commit any other Federal, State
24  or Local crime. He's prohibited from possessing any firearms
01:36PM 25  or other dangerous device. He shall not possess any illegal

*United States District Court*
*Camden, New Jersey*

Tatar not to give the map to anyone. Nevertheless, Tatar gave the map to

Omar on November 28, 2006.

On December 7, 2006, Joint Terrorism Task Force Officer Jay Rycek — Sean Brennan

interviewed Tatar about his statements. TFO Rycek asked Tatar three times

whether he had given the map to anyone, and each time, Tatar falsely denied

giving the map to anyone. Tatar also falsely denied that he knew that anyone

else besides Omar was involved in the attack, even though Tatar had

previously voiced concerns to Shnewer about whether Omar could be trusted.

Even on May 7, 2008, when TFO Rycek conducted a post-arrest interview of

Tatar, Tatar continued to deny that he had ever provided the map to anyone.

Tatar apparently discussed Omar's request for the map with Sgt. Dandridge in

order to learn whether Omar was in fact a "Fed," as Tatar had speculated, and

to create some exculpatory evidence in the event that Omar was a "Fed."

### 4.    Regardless of Tatar's Medical Conditions, Protection of Public Safety Conclusively Militates Against Release.

Courts have generally granted compassionate release to inmates far more

deserving of release than Tatar, such as where the inmate suffers from

significant ailments that specifically raise the risk of an adverse outcome from

COVID-19, is serving a short sentence or has served most of a lengthier one,

does not present a danger to the community, and/or is held at a facility where

a notable outbreak has occurred. *E.g.*, *United States v. Rodriguez*, 2020 WL

**AFFIDAVIT OF**
**SHAIN DUKA**

1. I, Shain Duka, have personal knowledge of a conversation between my codefendant, Serdar Tatar, and his attorney, Richard Sparaco, in the case *United States v. Shnewer et al*, No. 07-459, 2008 WL 4860403 (District of New Jersey).

2. Serdar Tatar clearly and explicitly made known to his attorney, Richard Sparaco, that he intended to take the stand in his own defense.

3. Mr. Sparaco denied his request stating that he was unprepared to call Serdar Tatar to testify and thus would not call him to the stand.

4. I have personal knowledge of this conversation because I was sitting right next to both Mr. Sparaco and Serdar Tatar at the defense table and was able to hear the entire conversation.

5. It was clear that Serdar Tatar intended to take the stand and his attorney prevented him from doing so.


Shain Duka

AFFIDAVIT

I Muslim Tatar of freemind and of rightful age give this Affidavit freely
and without coercement of any kind  or by way of threat.

That on or about December 15 or 16, 2008 i was at my sons "Serdar Tatar"
Jury trial  sitting behind the defense when i had over heard my son give
his attorney instructions to allow him to take the stand to testify ,because
my son wanted the Jury to know all the facts of why he was involved and why
he was attempting to stop the terror attack from happening .  That in reply
to my sons specific request to testify i over heard Tatar's Attorney tell
my son that he was not prepared for my sons testimony and denied my son to
take the stand .  Furthermore, this same day i over heard my sons Attorney
instruct my son to tell the court that he did not wish to take the stand on
his own behalf.


The above statement is true and correct to the best of knowledge and i had
executed the same statement to be true before the hand of a Notary Republic
On This 7th day of September 2018

Respectfully,

Muslim Tatar


Sworn to before me this 7th day of September, 2018  the same person
Named herein with proper identification  of the person executing this
document .

Notary of Republic

STEVEN VOSDIKIAN
ID # 2845449
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires June 2, 2021

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA          :          CRIMINAL NO. 07-459 (RBK)

v.                                                      :

SERDAR TATAR                                :

## CONTRACT

RICHARD SPARACO and SERDAR TATAR hereby agree to the following terms of attorney-client relationship:

1. Richard Sparaco ("attorney" herein) at no time has or will cooperate with "Prosecutor" or any other government agencies without the knowledge or consent of Serdar Tatar ("client" herein), except to the extent that attorney must cooperate with and abide by the Rules of Discovery, the Rules of Criminal Procedure, and his attorney Code of Professional Conduct.

2. Attorney will represent client with his utmost efforts, and protect every right reserved and allowed by law and constitutional provisions, rights, etc.,

3. Attorney and his supervised and unsupervised staff or agents, including investigation team, companies, contractors, paralegals, etc., that is paid or unpaid will be hereon under this contract. Also, attorney will be fully responsible for all actions taken the aforementioned persons who is involved with this case, in any relation or relevance.

4. Attorney agrees with client that he will work diligently with other defendants and their attorneys to his utmost abilities possible without compromising his ethical duty to client.

5. Although attorney is responsible for his client, attorney an client agree to work with the other defendants and attorneys in this case as one unit, team and body.

6. This is a private contract and will not be shown, given, copied or made available in any way for any purposes other that the codefendants and their attorneys. Unless the contract is violated.

7. Attorney agrees that there will not be any deliberate indifference due to the fact that his client and the other defendants are indigent, and that the attorneys are being paid by the government will not at all or in no circumstances will act in any unscrupulous way that will result in jeopardizing defendants' livelihood or case in any way.

8. Attorney agrees to keep client fully informed of all documents, motions, affidavit, or other papers filed or to be filed in this case, and that, except for what is required by the Rules of Criminal Procedure, will no provide the government with any information without the full knowledge of the client.

9. Attorney agrees that there will be no deceit, trickery, confusion, including but not limited to codes or acts of any kind that will endanger or jeopardize the livelihood, best interest, or case of the client.

RICHARD SPARACO, ESQUIRE
Attorney for Defendant, Serdar Tatar
1920 Fairfax Ave.
Cherry Hill, NJ 08003-2001
(856) 751-8888

SERDAR TATAR

FD-350 (Rev. 5-8-81)

(Mount Clipping in Space Below)

(Indicate page, name of
newspaper, city and state.)

"COURIER-POST"

Date: 4-29-09
Edition:

Title:

# 3 men get life in Fort Dix plot

## 2 others convicted in terror case scheduled to be sentenced today

**By ADAM SMELTZ**
Courier-Post Staff

CAMDEN

A federal judge ordered life sentences, Tuesday, for three former Cherry Hill men convicted in the Fort Dix terror-plot case.

U.S. District Judge Robert B. Kugler said the men — brothers Dritan "Tony" Duka, 30; Elvir Duka, 25; and Shain Duka, 28 — showed no remorse, Tuesday. He also suggested that the men, if released from prison, could pose a danger to the public.

"There's no question in my mind that they planned to kill people," Kugler said. "Nothing has greater impact on society than (a climate) of terrorism. By definition, it's designed to cause unrest."

The Duka brothers would not be eligible for parole in the federal system, but lawyers for all three men said they planned to appeal Kugler's decisions. Appeals must be filed within 10 days, according to federal rules.

Kugler, following federal guidelines, also sentenced Dritan and Elvir Duka to 30-year prison terms on top of their life sentences. He ordered each man to pay



DOUGLAS M. BOVITT/Courier-Post
**Relatives of the Dukas gather outside the courthouse.**


**DRITAN DUKA**


**ELVIR DUKA**


**SHAIN DUKA**



SSRA

b6
b7C

b3
b7E
FBI/DOJ

# Plot/Relatives say men innocent

Continued from Page 1A

$125,000 in restitution for security measures that the Army took in response to the alleged plot.

Eljvir Duka has demonstrated "no respect for the law," Kugler said. He quoted a letter that the defendant sent to the court after his conviction.

"Your entire system will be defeated by Islam," Eljvir Duka wrote, according to Kugler. ". . . There will be no stopping it, as is already clear."

Kugler said Eljvir Duka "is a danger (to the public) so long as he harbors that hatred and desire to kill." Assistant U.S. Attorney William E. Fitzpatrick said he believes the brothers were driven by religious fanaticism, "animosity toward our way of life" and a desire for revenge.

A jury in December found the Duka brothers and two others guilty of conspiring to kill U.S. military personnel at Fort Dix. Four were convicted on additional weapons charges, though all five were acquitted on

charges of attempted murder.

The two who did not appear in court Tuesday — Mohamad Ibrahim Shnewer, 24, of Cherry Hill, and Serdar Tatar, 25, of Philadelphia — are scheduled to be sentenced this morning. Of the five, only Shnewer is a U.S. citizen.

A sixth man, Agron Abdullahu, was charged only with gun offenses and later pleaded guilty.

The Duka family, including the Duka brothers and their parents, maintained in court Tuesday that the men were innocent, hard-working family men and the victims of a government conspiracy. At a press conference after the sentencing hearings, a representative of the Muslim-led Peace and Justice Foundation said the Duka brothers were entrapped in a federal investigation.

"This was an atrocity," said Mauri Saalakhan, the foundation representative. He said the Duka brothers were targeted because they are Muslims.

Dritan Duka, wearing a

green prison jumpsuit and shackles in court, said he and his brothers would never engage in the deadly plot of which they were accused. Weapons they obtained were used only for leisure and sport, he said.

And some secretly recorded conversations, quoted in court, were not a fair or accurate portrayal of his true intentions, Dritan Duka said. Defense attorneys have said that federal informants who befriended the Dukas had an influential hand in provoking those recorded conversations.

Defense attorney Michael Riley described the Duka brothers as blue-collar men who, beyond family life and hard work, didn't have a lot to look forward to. He thinks their conversations related to Fort Dix were driven, in part, by religion and in part by the rocky times rattling the country, he said.

But he does not believe that their faith affected the way they were treated in court, Riley said.

"Frankly, the only thing that motivated us here was the serious danger they

were putting members of the military in," said acting U.S. Attorney Ralph Marra Jr.

FD-350 (Rev. 5-8-81)

(Indicate page, name of newspaper, city and state.)

"COURIER-POST"

Date: 4-30-09
Edition:

(Mount Clipping in Space Below)

# Dix conspirator: I'm no jihadist



DOUGLAS M. BOVITT/Courier-Post
**Acting U.S. Attorney Ralph Marra Jr. says he was gratified by the Fort Dix plotters' sentences, even though the prosecution had sought life for Serdar Tatar.**

# Judge agrees, gives 5th plotter 33 years

By **ADAM SMELTZ**
Courier-Post Staff

**CAMDEN**

Serdar Tatar, the final defendant in the Fort Dix terror-plot case, on Wednesday received a 33-year prison sentence, the least severe punishment this week for five convicted conspirators.



DOUGLAS M. BOVITT/Courier-Post
**Relatives of Mohamad Shnewer attend a news conference Wednesday after he received a life sentence and a concurrent 30-year prison term.**

SSRA

b6
b7C

b3
b7E

U.S. District Judge Robert B. Kugler ordered life sentences for the other four defendants, all convicted in December of conspiring to kill military personnel at the Army base in Burlington County.

Kugler said he chose a less-severe punishment for Tatar, 25, of Philadelphia, because Tatar, unlike the other men, did not appear to be driven by religious fervor or hatred.

"What drove him is not what drove the other four in this case, and that makes a big difference," Kugler said of Tatar. "... The others are so consumed with hatred and ideology that they are not going to change. I'm not sure the same is true of Mr. Tatar."



SHNEWER     TATAR

In a second day of sentencing Wednesday, Kugler also handed down a life sentence and an additional, concurrent 30-year term for Mohamad Shnewer, 24, of Cherry Hill.

On Tuesday, Kugler issued life sentences plus 30 years for brothers Dritan "Tony" Duka, 30, Eljvir Duka, 25, and Shain Duka, 28, all formerly of Cherry Hill. He ordered them to pay $125,000 in restitution to the Army — money that would pay for security measures in response to the alleged plot.

Attorneys for the five Muslim defendants said they plan to appeal Kugler's sentences. Parole is not an option in the federal system.

But if Kugler's decisions stand, they will mark the final chapter of a three-year saga that began with a phone call to Mount

FD-350 (Rev. 5-8-81)

(Indicate page, name of
newspaper, city and state.)

"THE DAILY NEWS"

Date: 4-30-09
Edition:

Title:

(Mount Clipping In Space Below)

# 2 more sentenced in Ft. Dix case

## One man gets life, another gets 33 years

By **JASON NARK**
narkj@phillynews.com
856-779-3221

Actions and words from his past have loomed over Serdar Tatar since his arrest, and he said yesterday at his sentencing in the Fort Dix terror plot that he could barely sleep the night before.

Tatar's actions and words also kept U.S. District Court Judge Robert Kugler awake, as he pondered how a man who had said he always wanted to wear a police or Army uniform got caught up in a plot to kill U.S. military personnel at Fort Dix.

"I've thought long and hard about Mr. Tatar in this case," Kugler said. "I stayed up most of the night."

Kugler said that the words Tatar didn't say on recordings entered at trial convinced him that the Philadelphia resident was not a radical Islamist and could live a life outside prison someday.

Tatar, who supplied a map of Fort Dix to the government's top informant, yet also reported him to the police, was sentenced to 33 years for his role in the plot.

"Thank you, thank you," his sister, Serpil, said from the second row, as their mother looked to her

to translate the judge's sentence.

Earlier in the day, Mohamad Shnewer, whom the government call the plot's "epicenter," became the fourth defendant convicted of conspiracy to receive a life sentence. He was also sentenced to an additional 80 years for weapons offenses.

It was Shnewer, 24, of Cherry Hill who first suggested Fort Dix as a target and traveled to various military installations with the informant for surveillance. In recorded conversations, it was Shnewer who voiced the most religious fervor and vitriol toward



Serpil Tatar (right) is upset after her brother was sentenced.
—DAVID MAIALETTI / Staff photographer



SSRA

b6
b7C

b3
b7E

# Plot/4th conspirator gets life; judge points to religious fervor

Continued from Page 1A

Laurel police in January 2006.

Circuit City clerk Brian Morgenstern called authorities when he came across a video showing men who fired weapons and shouted "Allah Akbar."

Federal authorities, including the FBI, launched an investigation and began working with two informants to gather information about the men. They were arrested in May 2007, accused of conspiracy to murder military personnel and attempted murder.

A jury found the men guilty of conspiracy — but not guilty of attempted murder — after a 12-week trial and 5½ days of deliberations. A sixth man, Agron Abdullahu, was charged only with weapons offenses and pleaded guilty.

Appearing again before Kugler to be sentenced Wednesday, Shnewer and Tatar seemed to strike a more conciliatory tone than the Duka brothers did on Tuesday. Tatar spoke for more than half an hour after his wife, stepson, sister and parents offered emotional statements of support.

Tatar said Wednesday was his third anniversary. His wife, who identified herself as Khalidel Mirtayeva, wept in court and begged Kugler to forgive her husband.

"I truly apologize for what I have done," Tatar said soon thereafter. Prosecutors said he had offered his peers a map of Fort Dix as the terrorism plot unfolded.

But Tatar emphasized he went to the FBI when he thought his peers might be plotting a bona fide attack.

Prosecutors said that Tatar lied to the FBI about his role with the map — a point that Tatar conceded. Tatar said he feared that he was the target of a set-up.

"I was afraid. That's why I lied" to the FBI, Tatar said. "I almost (defecated) myself. Excuse my language."

Acting U.S. Attorney Ralph Marra Jr. said he was gratified by the sentences, even though the prosecution had sought a life sentence for Tatar. He said he saw Tatar as a "follower type."

Meanwhile, Assistant U.S. Attorney Michael A. Hammer Jr. said Shnewer stood "at the epicenter of this conspiracy," Shnewer apologized to his family on Wednesday.

But even though I spoke about attacking the military, I never intended to carry out those words," Shnewer said before Kugler. He said he was more concerned with his work and his family.

"I may have spoken like a jihadist, but I definitely don't have what it takes to be a jihadist," Shnewer said.

Still, Kugler said he agreed with prosecutors that Shnewer stood at the core of the plot. He cited recordings in which Shnewer talked of killing Jewish people, as well as evidence that Shnewer monitored Fort Dix.

"All he talked about was killing," Kugler said. "There's no question in my mind he was motivated by hatred of Jews and Americans."

FD-350 (Rev. 5-8-81)

(Indicate page, name of
newspaper, city and state.)

"PHILADELPHIA DAILY NEWS"

(Mount Clipping in Space Below)

Date: 4-29-09
Edition:

# Life terms for brothers in Ft. Dix case

## Judge cites terrorism, rejects their claims

By **JASON NARK**
nark@phillynews.com
856-779-3821

The Duka brothers cited Thomas Jefferson, clung to the First Amendment and even demanded ed to be set free during fiery speeches at their sentencing hearings in federal court yesterday.

It was the first time their words carried no weight since the investigation of the Fort Dix terrorism plot began more than three years ago.

When brothers Dritan, Eljvir and Shain Duka, all convicted by a jury in December of conspiring to kill U.S. soldiers at Fort Dix, finished their defiant speeches, U.S. District Judge Robert Kugler calmly explained why he believed none of it and handed out life sentences for all three men.

"Nothing has a greater impact on society than a crime of terrorism," Kugler said after sentencing Dritan Duka to life plus 30 years. "Were he free, he would continue his ideology and continue to organize to kill Americans."

Attorneys for all three Duka brothers said they were not surprised by the sentences, which Kugler himself said were "unprecedented" because of post-9/11 guidelines he was required to follow.

Many in the courtroom had heard hundreds of hours of secretly-recorded conversations between the Dukas, defendants Serdar Tatar and Mohamad Shnewer and two ex-confessed turned-informants, but yesterday marked the first time the brothers spoke in court.

"I am innocent. I am innocent. I am innocent," said Shain Duka,

the last of the three to be sentenced.

The Duka brothers, all brought into the country illegally from the former Yugoslavia as children, expressed anger toward

their attorneys for advising them not to testify during the trial, and Dritan Duka questioned Kugler for telling him to follow his attorney's advice.

Dritan Duka said there was



Associated Press

2 of the 3 brothers: Shain Duka (left) and Dritan Duka.



DAVID MAIALETTI / Staff photographer

Zurata Duka, mother of the brothers, speaks during a news conference yesterday at the federal courthouse in Camden.

SSRA

b6
b7C

b3
b7E

never a conspiracy between himself and the other defendants.

"There was a conspiracy against us, created, produced, and directed by the U.S. government," he said angrily.

Dritan and Shain Duka received additional 30-year sentences for purchasing automatic M-16 rifles and AK-47 assault rifles on May 7, 2007, at a Cherry Hill apartment rigged for surveillance.

Kugler said that Dritan and Shain's defense that the guns were merely for target practice during trips to the Poconos was "absolutely absurd."

Ferik Duka, the Dukas' father, told Kugler that he came to the United States illegally in 1984 and later moved to Cherry Hill to get a better life for his family.

And for the most part, life for the Dukas was good. Ferik was a successful businessman who paid taxes and although his sons dropped out of school and had run-ins with police, family life and Islam eventually changed them.

"I spent most of my time in this country happy, until now," he said.

The government said the Dukas' brand of Islam called for a holy war in the United States, one that would have begun with bloodshed at Fort Dix.

"There was no financial motive. There was nothing else. They seemed to be motivated entirely by revenge, by hatred and by animosity of our way of life," said Deputy U.S. Attorney William Fitzpatrick.

The Dukas were also ordered to pay $125,000 in restitution to the Army for security precautions at Fort Dix after the investigation began.

Shnewer and Tatar will be sentenced today. ★

the United States and Israel.

In a statement he gave prior to the sentencing, the Jordanian-born Shnewer apologized both to his co-defendants and his family.

"I put most of the blame on myself," he said.

But Shnewer, like the other defendants, also put a great portion of the blame on Mahmoud Omar, the ex-con turned government informant who recorded hundreds of hours of their conversations.

"I led a positive life before I met Mr. Omar," he said.

Most of the inflammatory things Shnewer said, were to im-press Omar and get him off his back, he told the court.

"I might have spoken like a jihadist," he said. "But I don't have what it takes to be a jihadist."

On Tuesday, the Duka brothers, Dritan, Eljvir and Shain Duka, all received life sentences for their roles. Dritan and Shain Duka were given an additional 30 years for trying to purchase machine guns and assault rifles inside a Cherry Hill apartment rigged with cameras.

After tearful statements from his family, Tatar, 25, recounted how he had contacted a Philadelphia police officer to inform him about Omar's persistent nagging about the map.

"I thought I was doing the right thing," he said. "And I ended up screwing it up for everyone."

When the FBI, who believed Tatar was just trying to weed out the informant, sat down to interview him several months later about his allegations, Tatar lied and told agents he didn't give the map to Omar.

After the hearing, Acting U.S. Attorney Ralph J. Marra said the case wasn't meant to set an example for would-be homegrown terrorists, but four life sentences and one 33-year sentence drives home a point.

"We are going to catch you," he said. "And then you are going to be severely punished, because of the devastating effect these types of acts have on society." ★

Serdar Tatar 61287-066    Case 1:07-cr-00459-RBK   Document 508   Filed 01/13/21   Page 52 of 52 PageID: 5694

FCI Memphis P.O. Box 34550

Memphis TN 38134

AS INSPECTED

12/31/2020



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS. FOLD AT DOTTED LINE

**CERTIFIED MAIL**

7017 2620 0000 8456 7476



U.S. POSTAGE PAID
FCM LG ENV
MEMPHIS, TN
38134
JAN 04, 21
AMOUNT
$0.00
R2304M118016-01

1000    08101

Clerk of the Court
United States District Court
For The District of New Jersey
401 Market St. PoBox 2797
Camden New Jersey 08101

"                    "
Legal Mail



RECEIVED

JAN 12 2021

AT 8:30 _____M
WILLIAM T. WALSH
CLERK

ı|ıllıılıılııılllıllıılıılıllıılıllıılıllıılıllıılllıı



Legal Mail (Open in presence of the Inmate)