UNITED STATES DISTRICT court
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SERDAR TATAR | : | HONORABLE ROBERT B. KUGLER |
| | : | CRIM. NO. 07-459 (RBK) |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | |

UNITED STATES' OPPOSITION TO MOTION FOR COLLATERAL RELIEF
PURSUANT TO FED. R. CIV. P. 59 AND 60

RACHAEL A. HONIG
ACTING U.S. ATTORNEY
970 BROAD STREET
NEWARK, NEW JERSEY 07102

NORMAN GROSS
ASSISTANT U.S. ATTORNEY
CAMDEN FEDERAL BUILDING &
 U.S. COURTHOUSE
401 MARKET STREET, 4TH FLOOR
CAMDEN, NEW JERSEY 08101
NORMAN.GROSS@USDOJ.GOV

## PRELIMINARY STATEMENT

Defendant Serdar Tatar has filed *pro se* what he has styled a "Motion for Relief Fed.R.Civ.P. 60(d)(3); 60(b)(3); 59(a)(1); and or 60(b)(6)" ("Motion") Crim.ECF502.[1] As explained below, this Court is without jurisdiction to consider this motion under either Rule 59 or 60. As also explained below, Tatar's claims in the Motion are meritless on their own terms. As such, this Court should dismiss the Motion and not refer it to the Court of Appeals pursuant to 28 U.S.C. § 1631 for consideration as a motion for authorization to file a second § 2255 motion.

After presiding over a two and one–half month jury trial and resolving numerous motions for collateral relief, this Court is well versed in the procedural history of this case. In brief, in December 2008, a jury convicted Tatar and his four codefendants, Mohammad Shnewer, Dritan Duka, Shain Duka, and Eljvir Duka, of Count One of the superseding indictment, charging conspiracy to murder members of the United States military, in violation of 18 U.S.C. §§ 1114 and 1117. Crim.ECF371. This Court sentenced Tatar to a prison term of 396 months and imposed life sentences on the other defendants

---

[1] All references herein to "Crim.ECF __" are to the docketed items in this criminal case. All references to "Civ.ECF __" are to the docketed items in the civil case arising from Tatar's motion for relief under 28 U.S.C. § 2255, *Serdar Tatar v. United States*, 13-cv-3317 (RBK).

for the conspiracy convictions. Crim.ECF417, 419, 421, 425, and 427. On

direct appeal, the Third Circuit affirmed the judgments. *United States v. Duka*,

671 F.3d 329 (3d Cir. 2011). On June 11, 2012, the Supreme Court denied

Tatar's petition for a writ of *certiorari*. 132 S. Ct. 2763 (2012). After requesting

an extension of time, Tatar filed his § 2255 motion on July 25, 2013,

Civ.ECF7, which this Court denied after substantial briefing, on February 11,

2016. Civ.ECF.43 and 44.

## ARGUMENT

**A.**   **TATAR'S MOTION IS EITHER AN UNAUTHORIZED SECOND OR SUCCESSIVE MOTION UNDER 28 U.S.C. § 2255 OR AN UNTIMELY MOTION FOR A NEW TRIAL, NEITHER OF WHICH THIS COURT CAN ENTERTAIN.**

This is Tatar's second collateral attack on his 2009 judgment.

Through the Anti-Terrorism and Effective Death Penalty Act of 1996

("AEDPA"), Congress imposed a stringent gatekeeping provision which

limited a prisoner's ability to file "second" or "successive" § 2255 motions. *See*

28 U.S.C. §§ 2244(a), 2255(h). Before a second or successive § 2255 motion

can be heard by the sentencing court, the petition must be certified by the

Court of Appeals as containing:

> (1)   newly discovered evidence that, if proven and viewed in
> light of the evidence as a whole, would be sufficient to
> establish by clear and convincing evidence that no
> reasonable factfinder would have found the movant guilty of
> the offense; or

> (2)   a new rule of constitutional law, made retroactive to cases
> on collateral review by the Supreme Court, that was
> previously unavailable.

28 U.S.C. § 2255(h). In other words, before Tatar could file a second § 2255

motion in this Court, he was required to file a motion in the Third Circuit

Court of Appeals for an order authorizing this Court to consider the motion.

**1.   TO THE EXTENT TATAR RELIES ON CIVIL RULE 60(b) AND (d),
THIS COURT IS WITHOUT JURISDICTION TO CONSIDER THE
MOTION.**

Tatar has not received permission from the Third Circuit to file the

Motion. In an apparent effort to side–step the statutory limitations on second

and successive § 2255 motions, Tatar purports to bring the present motion

under Federal Rules of Civil Procedure 59(a)(1) and 60((b)(3), (b)(6) and (d)(3).

That procedural maneuver avails him naught. To the extent that he invokes

Federal Rule of Criminal Procedure Rule 60(b) and (d), his failure to obtain

Circuit authorization for the Motion requires this Court to dismiss it.

Civil Rule 60 states in pertinent part:

> **(b) Grounds for Relief from a Final Judgment, Order, or
> Proceeding**. On motion and just terms, the court may relieve a
> party or its legal representative from a final judgment, order, or
> proceeding for the following reasons:
>
> *****
>
> (3) fraud (whether previously called intrinsic or extrinsic),
> misrepresentation, or misconduct by an opposing party;

*****

(6) any other reason that justifies relief.

*****

(d) Other Powers to Grant Relief. This rule does not limit a court's power to:

****

(3) set aside a judgment for fraud on the court.

Fed. R. Civ. P. 60(b)(3) and (6) and (d)(3).

Tatar claims the Government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny by failing to disclose certain "evidence (the hand-written notes of Sean Brennan)." Motion at pp.2–4, 6; ¶¶ 3–7; pp.6–8, ¶¶ 13-15, ¶ 19(a). He claims that alleged failure was a "fraud upon the Court." *Id*. at p.5, ¶ 10. He further claims he has repeatedly sought the "missing" hand–written notes "on several occasions," *id*. at p.6, ¶ 12, but does not say when or point to any documents memorializing those supposed requests, *id*.

Tatar further claims that (a) Task Force Officer ("TFO") Jay Rycek committed perjury at trial by testifying inconsistently with information in TFO Brennan's supposed hand–written notes and (b) prosecutors intentionally suborned that perjury. *Id*. at pp.6–7, ¶¶ 14–16. Specifically, Tatar claims that when TFOs Rycek and Brennan interviewed him on December 7, 2006 as part of the Fort Dix investigation, he told them that Mohammad Shnewer might be involved in the terrorist plot, but Rycek testified that Tatar mentioned only

Mohammad Omar (one of the Government's confidential informants) during that interview. *Id.* at p.7, ¶ 15.[2]

Tatar could have presented this claim on direct appeal or in his initial § 2255 motion. He claims he could not have raised this claim in time to file a timely motion for a new trial, presumably pursuant to Fed. R. Crim. P. 33. Motion, p.8, ¶ 19. But he admittedly raised his concern about the supposedly undisclosed hand–written notes at his sentencing hearing. *Id.* at p.5, ¶ 10. He does not contend he only learned of the supposed notes after this Court denied his § 2255 motion in February 2016.

Because the Motion presents a new collateral attack on his conviction based on *Brady*, it is a "new claim," not a procedural challenge to this Court's resolution of his § 2255 motion. *In re Pickard*, 681 F.3d 1201, 1205 (10th Cir. 2012) (*Brady* "claims are certainly second-or-successive claims because they assert a basis for relief from the underlying convictions"). "To the extent that [Tatar] collaterally attacked his … conviction and sentence under Rule 60(b),

---

[2] As an aside, Tatar claims that TFOs Rycek and Brennan violated his Fifth Amendment right by interviewing him "without an attorney present [and] warning against self-incrimination." Motion at 2, ¶ 3. Tatar never raised this claim at trial, on direct appeal, or in his § 2255 motion, even though he had all the information he needed to make that claim in all those proceedings. Consequently, he cannot raise it now. *See Ackermann v. United States*, 340 U.S. 193, 198 (1950) (failure to appeal cancellation of certificate of naturalization precluded relief under Rule 60(b)). Moreover, the claim is meritless. Tatar was never in custody when Rycek and Brennan interviewed him at his place of employment, a 7-11 store, on December 7, 2006. *See* TTr.4746. As such, the TFOs were not required to issue *Miranda* warnings before questioning Tatar. *See generally United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019).

the motion is a 'second or successive' § 2255 motion." *Pelullo v. United States*, 352 F. App'x 620, 625 (3d Cir. 2009) (not precedential) (citing *Pridgen v. Shannon*, 380 F.3d 721, 727 (3d Cir. 2004)). "Absent our prior authorization, the District Court lacked jurisdiction to consider the successive § 2255 motion." *Id.* (citing 28 U.S.C. §§ 2255(h) and 2244(b); *Robinson v. Johnson*, 313 F.3d 128, 139 (3d Cir. 2002)); *see also United States v. Baker*, 718 F.3d 1204, 1208 (10th Cir. 2013) (affirming dismissal of motion brought under Rule 60(d)(3)); *In re Robinson*, 917 F.3d 856, 864 (5th Cir. 2019) (same, motion brought under Rule 60(b)(6)); *United States v. Winston*, 346 F. App'x 520, 522 (11th Cir. 2009) (same, motion brought under Rule 60(b)(3)). Only when the Rule 60(b) motion attacks the manner in which the earlier *habeas* judgment was procured and not the underlying conviction may a district court adjudicate it without prior authorization. *See Gonzalez v. Crosby*, 545 U.S. 524, 533 (2005). This is not such a case.

Additionally, all the courts of appeals to have considered the question have held that a second–in–time motion brought by a federal or state prisoner raising *Brady* claims is subject to AEDPA's gatekeeping requirements for second-or-successive motions. *See Brown v. Muniz*, 889 F.3d 661, 668 (9th Cir. 2018); *In re Pickard*, 681 F.3d at 1205; *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1259–60 (11th Cir. 2009); *Evans v. Smith*, 220 F.3d 306, 323 (4th Cir. 2000). Tatar's *Brady* claim is "second or successive" under § 2255(h) and, thus, must be certified according to procedures prescribed in § 2244(b)(3) before this Court can consider it.

If a second or successive petition is filed in the district court without authorization of court of appeals, the district court may dismiss for want of jurisdiction or "shall, if it is in the interest of justice, transfer such action ... to any other such court in which the action ... could have been brought at the time it was filed." 28 U.S.C. § 1631; *see also Robinson v. Johnson*, 313 F.3d 128, 139 (3d Cir. 2002) ("When a second or successive habeas petition is erroneously filed in a district court without the permission of a court of appeals, the district court's only option is to dismiss the petition or transfer it to the court of appeals pursuant to 28 U.S.C. § 1631.").

Here, the "interest of justice" does not warrant transferring Tatar's motion to the Court of Appeals for possible authorization. Tatar does not purport to rely upon a new rule of constitutional law. As shown below, his legal argument that he was deprived of rough notes created by the investigators who interviewed him on December 7, 2006 do not amount to "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [him] guilty of the offense." 28 U.S.C.§ 2255(h).

Consequently, Tatar does not satisfy the standard under § 2255(h) for bringing a second or successive petition, so the interests of justice do not warrant transfer of this case to the Third Circuit to consider whether such authorization should be granted. See *Garcia v. United States*, 2019 WL 2234013, at *2–4 (D.N.J. May 23, 2019) (Simandle, J.); *see also Garcia v. United States*,

7

2011 WL 1792277, at *1–4 (D.N.J. May 10, 2011) (Simandle, J.) ("Although Garcia characterizes his motions pursuant to Rule 60(b) (and, occasionally in his October 6, 2010 motion, under Rule 60(d)) based on an alleged fraud on the Court), he is in fact offering new collateral attacks challenging the underlying conviction.").

### 2.   TO THE EXTENT TATAR RELIES ON CIVIL RULE 59(a), HIS MOTION IS UNTIMELY BY MANY YEARS AND THIS COURT IS POWERLESS TO GRANT IT.

Tatar also invokes Federal Rule of Civil Procedure 59(a)(1) as the procedural basis for his present motion. That rules states:

(a) In General.

(1) Grounds for New Trial. The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows:

(A)   after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court;

Fed. R. Civ. P. 59.

Unlike motions brought under Rule 60, a motion for a new trial under Rule 59 is not subject to the requirements of 28 U.S.C. § 2255(h). A "*timely* Rule 59(e) motion to amend or alter a judgment is not a second or successive petition, whether or not it advances a claim, and therefore such a motion lies outside the reach of the jurisdictional limitations that AEDPA imposes upon multiple collateral attacks." *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011)

(emphasis added). But Tatar's Rule 59(e) motion is not timely. "A motion for a new trial [under Federal Rule of Civil Procedure 59(a)] must be filed no later than 28 days after the entry of judgment." Fed. R. Civ. P. 59(b). As this Court's judgment against Tatar was entered on April 29, 2009, Tatar's deadline for filing a Rule 59(a) motion expired almost 12 years ago. This Court has "no power to entertain" an untimely motion under Rule 59. *John E. Smith's Sons Co. v. Lattimer Foundry & Mach. Co.*, 239 F.2d 815, 817 (3d Cir. 1956); *accord*, *Vincent v. Consol. Operating Co.*, 17 F.3d 782, 785 (5th Cir. 1994); *see also Rodick v. City of Schenectady*, 1 F.3d 1341, 1347 (2d Cir. 1993) (Rule 59 "time limitations are jurisdictional").

## B.   TATAR CANNOT DEMONSTRATE THAT THE GOVERNMENT SUPPRESSED ANYTHING.

Even if this Court had the authority to review the Motion, it should deny it as meritless. Under *Brady*, "suppression by the prosecution of evidence favorable to an accused … violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "There are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (emphasis added). The defendant has the burden of proving a *Brady* violation. *See id*. at 291 ("petitioner's burden is to establish a reasonable probability of a different result"); *accord, England v. Hart*, 970 F.3d 698, 716 (6th Cir. 2020) ("The defendant has the burden of proving a *Brady* violation.") (citing *Strickler*, 527 U.S. at 291); *United States v. Melgen*, 967 F.3d 1250, 1264 (11th Cir. 2020) ("it is the defendant's burden to show all the elements of a [*Brady*] violation"); *United States v. Lopez-Soto*, 960 F.3d 1, 12 (1st Cir. 2020) ("defendant has a threshold burden to show that learning the information altered the subsequent defense strategy, and that, given timely disclosure, a more effective strategy would likely have resulted") (internal punctuation omitted).

Tatar claims his attorney, Richard Sparaco, was ineffective for failing to obtain Brennan's hand-written notes. Motion at pp. 2–3; ¶ 4. A March 5, 2009 letter from then Deputy U.S. Attorney William E. Fitzpatrick to Sparaco puts the lie to that claim. In the letter, Fitzpatrick responded to Sparaco's request to confirm that TFO "Brennan took no notes during the December 7, 2006 interview of Mr. Tatar." *See* Exhibit A hereto. Fitzpatrick informed Sparaco that "FBI Special Agent John Ryan spoke with Special Agent Brennan[3] to

---

[3] As the FBI 302 for the December 7 interview confirmed, Brennan was a Task Force Officer, not an FBI Agent. *See* Exhibit B hereto.

confirm that Brennan took no notes," and that "Brennan did confirm that he took no notes and even went back and checked the file to be certain." *Id.*

Tatar now claims, fourteen years after the fact and based on nothing, that TFO Rycek lied about the existence of Brennan's hand–written notes. As Fitzpatrick's letter confirms, TFO Brennan "checked the file to be certain," and confirmed that "all information provided by Mr. Tatar was properly set forth in the FBI 302 report." In other words, there were no hand–written notes.

The Government has recently confirmed the accuracy of Fitzpatrick's letter to Sparaco. As established by the sworn declaration of Linda Eustace, an FBI Operation Support Technician, she checked the FBI case folder for the Fort Dix investigation to try to locate any rough notes from the December 7 interview. Exhibit C, Eustace Declaration at ¶¶ 8–20, 13–14. Had such notes been made, they would still be in the FBI case file. *Id.* at ¶ 11. No such notes are in that file, strong evidence that none were ever created. *Id.* at ¶¶ 12, 15. Plainly, evidence that did not exist cannot be suppressed, so the Government could not have violated *Brady* by failing to turn over the non-existent hand-written notes. *See generally Carusone v. Warden, N. Cent. Corr. Inst.*, 966 F.3d 474, 478–79 (6th Cir. 2020) (where recantation of a prosecution witness "did not exist at the time of trial," it "was not 'suppressed' within the meaning of *Brady*").

Tatar claims that TFO Rycek "admitted to the existence of the notes" during his trial testimony. Motion, p.3, ¶ 5. That is incorrect. After Rycek acknowledged on cross-examination that he did not record the December 7 interview, the following colloquy occurred:

Q:   And instead of listening to an audio or looking at a video of what your questions were, today we have to rely on what you remember two years ago, correct?
A:   That's correct.
Q:   Okay. But your memory is helped or refreshed by your notes and your reports; correct?
A:   Absolutely.
Q:   And you today have to rely upon what you wrote in your report versus what your specific recollection if of what happened two years ago, correct?
A:   I pretty much recall the incident.

            * * * *

Q:   And [Tatar] gave you the number of 856-669-1233; do you remember that?
A:   I would have to refer to the 302 as far as the exact phone number, but he did give me his phone number.

Tr. 4759, 4761.

That testimony is not an admission that TFO Rycek or TFO Brennan ever prepared hand-written notes of the interview. First, Rycek never said he had taken notes during the interview. Second, his statement that his memory "is helped or refreshed by" his notes and reports, in context, likely referred to his general experience or practice and not what happened during the December 7 interview. When Rycek was later asked about the telephone

12

number Tatar gave the TFOs for Omar during the interview, Rycek referred
only to the "302 report," not to any notes. Fitzpatrick's letter to Sparaco and
Eustace's recent review of the file demonstrate that the notes simply do not
exist.

### C.   TATAR CANNOT MEET *BRADY*'S MATERIALITY REQUIREMENT.

Nor can Tatar satisfy *Brady*'s material standard. "'[E]vidence is
'material' within the meaning of Brady when there is a reasonable probability
that, had the evidence been disclosed, the result of the proceeding would have
been different.'" *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (quoting
*Cone v. Bell*, 556 U.S. 449, 469–470 (2009)). "A 'reasonable probability' of a
different result" is one in which the suppressed evidence " 'undermines
confidence in the outcome of the trial.'" *Id.*, (quoting *Kyles v. Whitley*, 514 U.S.
419, 434 (1995)). Addressing such a claim here requires consideration of the
Government's overwhelming trial evidence of Tatar's guilt. *Id.* ("We must
examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of
the entire record,'") (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

The trial evidence, particularly Tatar's covertly recorded conversations
with Mahmoud Omar, a Government informant, buried Tatar. In one such
conversation on October 31, 2006, Omar asked Tatar for information

regarding Fort Dix, which Tatar readily provided. GX617B, A2096-97.[4] Omar revealed that he and Shnewer needed the information to attack the Fort Dix military base, whereupon Tatar volunteered to provide them with a map. A2098-99.

On November 9 and 12, Tatar assured Omar that he would provide the map of Fort Dix. GX619B, A2103, GX620B, A2105, GX621B, A2116-17. On the 12th, Tatar reiterated that he understood the purpose of the map and his agreement to assist the attack. Although Tatar initially questioned their readiness for the attack, he later assured Omar that "I'm in, honestly, I'm in," and that he believed that the attack was "a good thing to do." A2114.

Tatar also volunteered information about an electric power station at Fort Dix the conspirators could disable during an attack. A2115. Confirming again that he understood the purpose for which Shnewer and Omar wanted the map, Tatar stated, "I understood right away, trust me. I understood." A2118. But Tatar was suspicious of Omar, and stated, "[b]ut then again, it makes me

---

[4] Citations to "A__" are to the page numbers of the defendants' Appendix filed in their direct appeal. Citations to "SA__" are to the Government's Supplemental Appendix in the direct appeal. References to "GX__" are to the Government's trial exhibits, copies of which were reproduced in the Appendix and Supplemental Appendix. Citations to "TTr.__" are to the trial transcript. The Government has supplied the Court and Tatar with digital copies of all those documents together with this Opposition.

think, you know, like, how do I know you're not a Fed? You know.... How do I know who you are?" A2119.

On November 15, while Tatar was working at a 7-11 convenience store in Philadelphia, he talked to Philadelphia Police Department Sergeant Sean Dandridge. TTr.4712-13. In an apparent attempt to either discover whether Omar was an informant and/or to provide cover for himself, Tatar told Sergeant Dandridge that a man had approached Tatar about a map of Fort Dix, and Tatar was concerned that the man was up to no good. TTr.4713.

But Tatar declined to tell Sergeant Dandridge that: (1) Tatar had already agreed to deliver the map to Omar; (2) Shnewer was also involved in the plot; and (3) Tatar had volunteered information about the electric power station at Fort Dix on November 12. TTr.4714-16. Sergeant Dandridge told Tatar not to give the map to anyone, then contacted the FBI. *Id*.

On November 28, Tatar and Mahmoud Omar discussed the Fort Dix map. TTr.2865-66. Tatar acknowledged that by giving the map to Omar, "I'm getting involved in it, you understand? I'm involved in it by giving you the map." GX616B, A2123. Tatar observed that "[t]his is nothing small," A2124, and "this is very big, you know?" A2125. Tatar then asked Omar, "[a]m I going to be able to get away," and sought assurances that Omar would help Tatar escape from the United States to avoid apprehension by law enforcement

15

officials. A2129, A2135. Tatar then acknowledged that he did not "know whether you're FBI ... whether you're an agent, I don't know." A2134. He then declared:

> I'm gonna do it. Even, whether you are or not, I'm gonna give it to you. You know why?.... It doesn't matter to me, whether I get locked up, arrested, or they take me away, it doesn't matter. Whether I die, don't matter, I'm doing it in the name of Allah.

A2135.

Tatar also proposed to Omar that they could do something "from inside." A2139. Tatar said that he had tried to become a police officer to get "inside information." *Id.* He had also attempted to enlist in the United States Navy. TTr.5174. In the evening of November 28, Tatar called Omar and told him that Tatar had left the Fort Dix map hidden outside Omar's apartment complex. TTr.2866. Tatar gave Omar the precise location and description of the map. GX627B, A2148. Omar retrieved it exactly where Tatar had said it would be. TTr.2501, TTr.2867.

On December 7, Rycek and Brennan interviewed Tatar about his earlier statements to Sergeant Dandridge. TTr.4745-46. Rycek asked Tatar three times whether he had given the map to anyone, and each time, Tatar falsely denied doing so. TTr.4747. Tatar also falsely denied that he knew that anyone besides Omar was involved in a possible attack. *Id.*

Five months later, federal agents recovered the map from a bedroom

closet of Shnewer's residence during a search on May 7, 2007. TTr.1995-97.

When Rycek conducted a post-arrest interview of Tatar on that day, he

continued to falsely deny that he had given the map to anyone. TTr.4748,

TTr.4753.

Weighed against that powerful evidence, the supposedly suppressed

information would have provided no defense at all. That much is clear from

this Court's denial of one of Tatar's claims in his § 2255 motion. There, Tatar

claimed that trial counsel, Sparaco was ineffective for failing to "allow [Tatar]

to testify in his own defense [at trial] or obstructing [Tatar's] right to provide

evidence in his own defense." ("the testimony obstruction claim"). ECF27,

p.9, Memorandum of Law ("ML"), pp.18–24.

In its opposition to Tatar's § 2255 motion, the Government argued, *inter*

*alia*, that Tatar's proposed testimony would not satisfy *Strickland*'s prejudice

requirement. Civ.ECF36, pp.30–37. "[T]he appropriate test for prejudice finds

its roots in the test for materiality of exculpatory information not disclosed to

the defense by the prosecution." *Strickland v. Washington*, 466 U.S. 668, 694

(1984). "[T]he "defendant must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would

have been different." *Id*. "A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Id.*

17

In his § 2255 motion, Tatar suggested that, had he testified, he would have advanced a defense of withdrawal from the conspiracy. ML18. The Government argued that such a claim would have been self-defeating. Civ.ECF36, pp.35–37. Even after a legally sufficient withdrawal, "[t]he defendant is still liable [] for his previous agreement and for the previous acts of his co-conspirators in pursuit of the conspiracy." *United States v. Read*, 658 F.2d 1225, 1232 (7th Cir. 1981). Withdrawal merely "starts the clock running on the time within which the defendant may be prosecuted and provides a complete defense when the withdrawal occurs beyond the applicable statute–of–limitations period." *Smith v. United States*, 568 U.S. 106, 111 (2013). Here, there was no dispute that the initial May 7, 2007 Indictment was brought within the limitations period. Tatar's proposed withdrawal defense, far from exonerating Tatar, would have only cemented his fate, because "[f]ar from contradicting an element of the offense, withdrawal presupposes that the defendant committed the offense." *Smith*, 568 U.S. at 110–11.

By opinion and order dated February 11, 2016, this Court denied Tatar's § 2255 motion. Civ.ECF43 and 44. With respect to the testimony obstruction claim, this Court held that presentation of a withdrawal defense would have been self–defeating:

> Mr. Tatar's withdrawal defense is not a complete defense, but rather, only starts the running of the statute of limitations.

Assuming arguendo that Mr. Tatar affirmatively withdrew from the conspiracy, the only impact of that defense would have been whether the conspiracy charge against him was timely. However, as previously stated, the conspiracy charge was timely. Thus, Mr. Tatar's withdrawal defense, which is the stated reason why Mr. Tatar says he wanted to testify, would not have changed the outcome of the proceedings to a reasonable probability because the charge was timely. Accordingly, this Court is clearly able to decide Mr. Tatar's Claim IV solely on the prejudice prong of the *Strickland*.

Civ.ECF43, p. 23.

Tatar contends that, contrary to TFO Rycek's trial testimony, Tatar told Rycek that Shnewer as well as Omar was involved in the plot to attack Fort Dix. The undisclosed hand–written notes supposedly would have confirmed that claim. Motion, p.4, ¶ 9; p. 6, ¶ 13; p.7, ¶ 15. According to Tatar, the supposedly suppressed notes were exculpatory because they would have contradicted the Government's claim that Tatar withheld Shnewer's name when he spoke to the TFOs.

Tatar's *Brady* claim fails for the same reason that his testimony obstruction claim fails. Assume the following counter–factual events: (a) Tatar informed Rycek and Brennan of Shnewer's name and telephone number; (b) Rycek lied when he denied that Tatar disclosed that information; (c) Rycek's or Brennan's hand-written notes would have revealed that disclosure; and (d) Tatar could have used the notes at trial to force Rycek to concede that Tatar told Rycek and Brennan about Shnewer. Even with that purely hypothetical

level of success, the most that Tatar could hope to achieve was that he withdrew from the conspiracy based on his statements to Sgt. Dandridge and TFO's Rycek and Brennan. But even that would have been an incomplete withdrawal because Tatar does not dispute that he lied to Dandridge, Rycek, and Brennan when he told them he did not give the Fort Dix map to Omar.

For the same reasons Tatar's failed testimony obstruction claim could not satisfy the *Strickland* prejudice requirement, his current *Brady* claim cannot satisfy *Brady*'s materiality requirement. *Strickland*, 466 U.S. at 694. That's because "'*Brady* materiality and *Strickland* prejudice are the same.'" *United States v. Olsen*, 704 F.3d 1172, 1187 (9th Cir. 2013) (quoting *Gentry v. Sinclair*, 693 F.3d 867, 889 (9th Cir. 2012)), *as amended*, 705 F.3d 884, 906 (9th Cir. 2013) (same standard for *Strickland* prejudice and *Brady* materiality); *see also United States v. Payano*, 930 F.3d 186, 192–93 (3d Cir. 2019) (equating *Brady* materiality and *Strickland* prejudice).

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court dismiss the Motion and not transfer it to the Court of Appeals.

Respectfully submitted,

Rachael A. Honig
Acting U.S. Attorney

Assistant U.S. Attorney
Camden Federal Building &
 U.S. Courthouse
401 Market Street
4th Floor
Camden, New Jersey 08101

Date: March 15, 2021
Camden, New Jersey

21

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2021, I caused a copy of the attached United States' Response To Petitioner's Motion For Collateral Relief Pursuant To Fed. R. Civ. P. 59 And 60, together with the attached exhibits, to be served by postage prepaid First Claim United States Mail on:

Serdar Tatar
BOP Inmate # 61287-066
FCI Memphis
P.O. Box 34550
Memphis, TN 38134

Norman Gross
Assistant U.S. Attorney